Delbert W. COLEMAN and Karen A. Graham, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 92–1902, 92–1903.

United States Court of Appeals, Seventh Circuit.

Argued May 4, 1993.

Decided Feb. 23, 1994.

David J. Fischer, Stuart E. Horwich, Roger A. Pies (argued), Zapruder & Odell, Washington, DC, for petitioners-appellants.

Richard Farber, Gary R. Allen, Bridget Rowan, Frank P. Cihlar (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee.

Before CUDAHY, FLAUM, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

These consolidated tax appeals involve a 1975 computer sale and leaseback transaction between Bari Associates (Bari) and CIG Computer Products, Inc. (CIG Products). Delbert W. Coleman[1] is one of twenty-two limited partners in Bari, a Connecticut limited partnership. As a result of the transaction, Bari reported substantial losses in the tax years 1975 and 1976, primarily based on depreciation expenses that exceeded income. Coleman and the other Bari investors allocated these losses among themselves and applied them as deductions in computing their respective federal income taxes. The Commissioner of Internal Revenue challenged these deductions on the grounds that the transaction was a sham and lacked economic substance, that Bari lacked sufficient benefits and burdens of ownership to be treated as the owner of the computer equipment for tax purposes and that Bari did not enter into the transaction with an intent to make a profit. Coleman filed timely petitions challenging the Commissioner's disallowance of the Bari deductions for 1975 and 1976. Each of these tax years was addressed in a separate proceeding before the Tax Court, and in each instance the court upheld the Commissioner's disallowance. *Coleman v. Commissioner,* 53 T.C.M. (CCH) 598, 1987 WL 40311 (1987) (*Coleman I*); *Coleman v. Commissioner,* 58 T.C.M. (CCH) 1525, 1990 WL 17274 (1990) (*Coleman II*). Coleman now appeals these adverse rulings, which have been consolidated for purposes of appeal. We affirm.

## I. Background

Bari was a limited partnership formed in 1974, to which Coleman contributed $150,000 in 1975. On June 30, 1975, Bari entered into an agreement with CIG Products to purchase over 1,900 pieces of computer equipment.[2]

At the time Bari purchased this computer equipment, 90% of the equipment was under lease from CIG Products to third parties, with the remaining equipment available to be leased. Further, the computer equipment purchased by Bari was subject to bank liens not in excess of $21,000,000. Despite these significant liens, Bari agreed to pay a purchase price of $25,000,000 for the equipment and to subordinate its security interest to the bank liens.

Bari agreed to pay $1,900,000 in cash as a downpayment, with the remaining $23,100,000 of the purchase price in the form of a nonnegotiable, nonrecourse promissory note. Terms of the note required Bari to repay the note in installments over the course of eight years with a final "balloon payment" of $6,500,000 due on June 30, 1983. The note was accompanied by a security agreement under which CIG Products' only recourse was to the equipment itself, with Bari and the limited partners having no personal liability.

At the time of sale, Bari leased the equipment back to CIG Products for a period of eight years, paralleling the term of the note. In addition, the lease allowed Bari to set off rental payments due from CIG Products against its obligations under the promissory note. Under this arrangement, the rent payable by CIG Products covered all of Bari's monthly note payments except the final $6,500,000 balloon payment, and also provided Bari with an additional $1,950,240, or $50,-

---

1. Karen A. Graham is a party to these proceedings only because she was married to Coleman in 1975 and filed a joint return for that year.

2. At the time of this arrangement, CIG Products was a wholly owned subsidiary of Computer Investors Group, Inc. ("CIG"), a publicly traded company.

240 after recouping the downpayment, prior to the balloon payment.

Further, the arrangement between Bari and CIG Products was a "net" lease, under which CIG Products was obligated to pay not only rent but also taxes and any expenses connected with repairs or with damage, destruction or loss of the equipment. Broad provisions of the lease made CIG Products responsible "for all costs and expenses of any nature whatsoever, arising out of or in connection with or related to this Lease or the Equipment," unless specifically provided otherwise. CIG Products also agreed to insure the equipment to its full value and to hold Bari harmless and indemnify it from any liabilities arising from the equipment.

The lease also granted CIG Products broad powers over the equipment, including the power to dispose of any or all of it, provided similar equipment was substituted. In addition, CIG Products could enter into commercially reasonable subleases extending beyond the term of the Bari lease and subject the equipment to additional liens.[3]

These sale and leaseback arrangements generated heavy losses for Bari in 1975 and 1976, allocable to its limited partners including Coleman. The Commissioner challenged Coleman's deductions of the losses, resulting in the Tax Court cases that are the subject of this appeal.

### A. Coleman I *Litigation*

In *Coleman I,* the Tax Court disallowed the 1976 deduction, holding that Bari had not acquired sufficient benefits and burdens of ownership of the computer equipment to be treated as an owner for federal tax purposes.

*Coleman I* relied heavily on expert testimony with respect to the residual value of the computer equipment at the end of the lease term. The government expert, Frederic Withington, testified that, due in part to the technical advances that quickly make computer equipment obsolete, a 1975 investor would have estimated the 1983 residual value to be between $1,892,093 and $2,292,093. On the other hand, Coleman's expert, Svend Hartman, did not believe that a 1975 investor would predict that the equipment would become obsolete as rapidly as did Withington. Hartman testified that in 1975 he would have projected a 1983 residual value between $2,467,000 and $8,580,000.[4] The Tax Court found Withington's testimony more credible than Hartman's because Withington presented what the Tax Court believed to be more reliable evidence, and the range of Hartman's estimates was too broad to be of practical value.

Using Withington's low estimates of residual value—far less that the $6,500,000 balloon payment—Bari could have had no intention of making the final payment and taking possession of the equipment at the end of the lease period. Any loss or gain accruing to Bari would result from the fixed periodic payments under the contract and have no relation to the equipment itself. Thus the Tax Court concluded that Bari did not acquire sufficient benefits or burdens to be treated as the owner of the equipment.

---

**3.** The lease allowed CIG Products to incur up to $26,000,000 in new underlying liens until March 1977. After this date, CIG Products could incur new underlying liens only up to the greater of either the outstanding balance of Bari's promissory note or the present value of all rentals payable to CIG Products on or before June 30, 1983, assuming that all subleases were terminated by the sublessee at the earliest time permitted. All liens were required to be discharged upon full payment of Bari's promissory note.

**4.** Before the deal closed, only an expert hired by CIG Products, Robert Lew, had appraised the property for fair market value and residual value. Lew appraised the equipment at a fair market value of $25,357,993 and estimated the equipment's residual value to be at least $6,669,150.

CIG Products provided these estimates to David Hurwitz, Bari's chief negotiator, on the day of closing.

Hurwitz testified that the entire transaction was conditioned on an appraisal demonstrating that the fair market value of the equipment was at least $25,000,000 and that the residual value of the equipment could reasonably be expected to exceed $6,500,000 on June 30, 1983; but Hurwitz failed to have his own appraisal conducted. He also testified that he was not qualified to make such a determination. Thus it comes as no surprise that the Tax Court was "not convinced that the transaction was conditioned upon the estimates in Lew's appraisal or that Lew's appraisal had any impact on the terms of the transaction as negotiated by the parties."

Subsequently, Coleman moved to reopen the record or, in the alternative, to hold an evidentiary hearing to determine if the record should be reopened to receive new evidence. Before the trial in *Coleman I*, Withington, under subpoena, had produced documents prepared by him in connection with his testimony. After *Coleman I* and during the *Coleman II* litigation, Coleman discovered documents that Withington had not produced in response to the subpoena in *Coleman I*. Coleman argued that this new evidence suggested a residual value estimate as of 1975 that would be markedly higher than what Withington had indicated at trial.

In a separate opinion denying these motions, the Tax Court rejected Coleman's characterization of the missing documents. *Coleman v. Commissioner*, 57 T.C.M. (CCH) 493, 1989 WL 52685 (1989). The court concluded that the new evidence was in fact consistent with Withington's testimony. As a result, the Tax Court refused to reopen the record because the evidence was merely cumulative and impeaching. *Edgar v. Finley*, 312 F.2d 533 (8th Cir.1963); *Kithcart v. Metropolitan Life Ins. Co.*, 119 F.2d 497, 500 (8th Cir.1941), *cert. denied*, 315 U.S. 808, 62 S.Ct. 793, 86 L.Ed. 1207 (1942).

### B. Coleman II *Litigation*

Coleman's federal income tax deductions for 1975 were addressed in a separate proceeding before the Tax Court. *Coleman II*. The Tax Court, however, ordered Coleman to show cause why the decision of *Coleman I* should not control the decision in this second case. In response, Coleman pointed to the documents that Withington had failed to produce pursuant to a subpoena in *Coleman I*. Coleman argued that this evidence justified a new trial. Coleman also sought to call two witnesses to give additional expert testimony regarding residual value.

The Tax Court in *Coleman II* held an evidentiary hearing to resolve the issues of Withington's subpoena compliance. At the hearing, Withington explained that he had not produced the documents in question because they were either cumulative, redundant or not relevant to the equipment at issue. After reviewing the evidence, the Tax Court

agreed and determined that additional expert testimony regarding these documents would also be needlessly cumulative or irrelevant. Accordingly, the court denied Coleman's request to call expert witnesses for additional rebuttal testimony on the residual value issue.

During the evidentiary hearing, Withington revised his prior testimony with respect to the residual value of the computer equipment. Instead of arriving at a residual value estimate of $1,892,093 to $2,292,093, as he had at trial in *Coleman I*, Withington now estimated a residual value of $3,550,193 to $4,339,125. These revisions were based upon sources that were not available to Withington at the time of *Coleman I* and also reflected the inclusion of an allowance for the scrap value of the equipment. While the Tax Court conceded that these revisions weakened Withington's testimony, it regarded the revisions as generally reasonable. The Tax Court concluded that even under the revised estimates, the decision in *Coleman I* would remain unchanged.

The *Coleman II* litigation was eventually resolved in favor of the Commissioner. The Tax Court followed the reasoning in *Coleman I* and found that Bari failed to acquire sufficient benefits and burdens of ownership to be entitled to tax deductions.

### II. *Analysis*

The central issue presented by this consolidated appeal involves the legitimacy of the sale and leaseback transaction between Bari and CIG Products, turning on whether Bari acquired sufficient benefits and burdens of ownership to be treated as the owner of the computer equipment for tax purposes.

■■■ "The general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n. 16, 98 S.Ct. 1291, 1302 n. 16, 55 L.Ed.2d 550 (1978). Our review of the Tax Court's factual conclusions "is limited to a determination of whether the tax court was 'clearly erroneous'." *Nickerson v. Commissioner*, 700 F.2d 402,

405 (7th Cir.1983) (citations omitted); *see also Estate of Kraus v. Commissioner*, 875 F.2d 597 (7th Cir.1989). A finding of fact can be reversed as clearly erroneous only when " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Coleman's arguments, however, fall considerably short of creating a conviction of error.

### A. Coleman I

On appeal of *Coleman I*, Coleman contends that the Tax Court improperly "recharacterized" the transaction between Bari and CIG Products as a financing transaction. Further, Coleman argues that *Lyon*, 435 U.S. 561, 98 S.Ct. 1291, demands that we respect the sale and leaseback and permit Bari to take depreciation on the equipment. We review these issues de novo.

■ First, the Tax Court held that Bari was not the owner of the equipment for federal tax purposes and commented that the transaction had many of the aspects of a financing arrangement. Because ownership, and the ability to take depreciation, was the real heart of the matter, the observation that the transaction resembled a financing arrangement is not of central importance and certainly could not be a basis for reversal.

■ Second, Coleman's reliance on *Lyon* is misplaced. In *Lyon*, the Supreme Court held that the sale and leaseback form of a transaction adopted by the parties governs for tax purposes only when "the lessor retains significant and genuine attributes of the traditional lessor status." *Id.* at 584, 98 S.Ct. at 1304. Accordingly, it is the existence of the benefits and burdens of ownership, and not solely the form of the transaction, that determines how a sale and leaseback agreement will be treated for tax purposes. *See id.* at 582–84, 98 S.Ct. at 1303–04.

*Lyon*, which involved the sale and leaseback of a bank building, is clearly distinguishable. In *Lyon*, the building in question was constructed on a bank's property, sold to the taxpayer, the Frank Lyon Company, and then leased back to the bank. However, the bank leased the ground under the building to Lyon for a period of 76 years and 7 months. Lyon financed the transaction with a cash downpayment of $500,000 and a substantial loan from another bank.

The term of the original lease of the building was 25 years, precisely matching the term of a mortgage on the building obtained by Lyon from the third party. Additionally, the bank held several options which, if exercised, would assure the bank of possession of the building for 65 years while effectively limiting Lyon's interest to a recovery of its $500,000 plus 6% compound interest. The Court noted that if the bank did not choose to exercise its options, Lyon would remain liable for the substantial rents due under the ground lease. *Id.* at 567 n. 3, 98 S.Ct. at 1295 n. 3. Further, although the bank had agreed to make rental payments to Lyon in amounts equal to the mortgage payments on the building, if any difficulties arose, "the obligation on the notes fell squarely on Lyon." *Id.* at 577, 98 S.Ct. at 1300. "Lyon ... exposed its very business well-being to this real and substantial risk." *Id.* It was Lyon's assumption of certain liabilities, providing a "distinct element of economic reality," *id.*, that moved the Court to respect the form of the transaction. This critical fact clearly distinguishes *Lyon* from the present transaction. Unlike Lyon, Bari did not undertake any substantial financial risk after making its downpayment. Bari was not liable to a third party on a substantial debt. The lease with CIG Products allowed Bari to set off any unpaid rental obligations against its installment obligations. Unlike *Lyon*, if the lessee failed to make its lease payments, the lessor (Bari) would not have to provide its own capital to make mortgage payments to a third party.

In addition, CIG Products expressly waived any right to proceed personally against Bari or any of its partners. If Bari did not make its final balloon payment on the equipment, CIG Products' only remedy was to foreclose on the equipment. Thus Bari had the option of abandoning the equipment

in 1983, leaving CIG with no recourse against Bari or its partners. Throughout the course of the Bari transaction, under no scenario would Bari be required to shoulder liability. In this situation, Bari cannot claim that it "exposed its very business well-being to ... real and substantial risks." *Id.*

Estimates of residual value are basic to the Tax Court's finding on the benefits and burdens of ownership. Coleman vigorously challenges the evidence relied on by the Tax Court to determine residual value.

■ Coleman contends that residual value should not be essentially dispositive of ownership for tax purposes. He urges that other factors be given equal consideration with residual value.[5] It is true that several factors have been recognized as particularly useful for determining whether a taxpayer should be treated as an owner for tax purposes. *See, e.g., Lyon,* 435 U.S. at 572–81, 98 S.Ct. at 1298–1303; *M & W Gear Co. v. Commissioner,* 446 F.2d 841 (7th Cir.1971); *Breece Veneer & Panel Co. v. Commissioner,* 232 F.2d 319 (7th Cir.1956). However, in a sale and leaseback, a lessor can be considered the owner only if she retains significant and genuine attributes of the traditional lessor status. *Lyon,* 435 U.S. at 584, 98 S.Ct. at 1304. Further, "[w]hat those attributes are in any particular case will necessarily depend upon its facts." *Id.*

The facts of *this* case appear to make the residual value issue the foremost consideration.[6] Because, as we have noted, Bari shouldered none of the burdens of ownership, an examination of Bari's *benefits,* if any, apparently will go far to resolving the issue of ownership for tax purposes.

If in 1983 Bari concludes that the equipment's residual value will be less than the $6,500,000 balloon payment, Bari will forego the payment and allow CIG Products to take the equipment. As a result, Bari would never use the equipment and would not profit from its residual value or from its income producing potential. Here the *Coleman I* Tax Court accepted Withington's opinion that in 1975 a reasonable investor would estimate the equipment's 1983 residual value between $1,892,093 and $2,292,093. These figures were later revised by Withington in *Coleman II* to a residual value of between $3,550,193 and $4,339,125, with a midpoint of $3,944,659. Using either figure, we find that a reasonable investor would not have expected a residual value greater than or equal to $6,500,000, and thus achieved slight chance of benefit.

Coleman argues that, similar to a true owner, Bari was positioned to gain 100% of the "upside" potential because it would receive any profits from the equipment should the residual value be greater than $6,500,000 when the balloon payment became due. But the chance that the property would be worth more than $6,500,000 in 1983 is too slight; Bari was really not exposed to any burdens and had no reasonable expectation of profit.

Coleman argues that additional factors considered by other courts demonstrate ownership and outweigh the importance of residual value. *See, e.g., Torres v. Commissioner,* 88 T.C. 702, 720–27, 1987 WL 39958 (1987); *West v. Commissioner,* 48 T.C.M. (C.C.H.) 796, 798–802, 1984 WL 15071 (1984); *Grodt*

---

5. Coleman proposes that we adopt a three part test for tax ownership: "(1) whether the lessor retained an asset of value at the end of the lease term, (2) whether the lessor made a significant equity investment in the leased property at some point during the lease term, and (3) most importantly, whether the lessor retained either the 'upside' potential for economic gain or the 'downside' risk of economic loss normally associated with the ownership position of a lessor." Michael Simonsen, *Determining Tax Ownership Of Leased Property,* 38 Tax Lawyer 1, 3 (1985). While we recognize these factors as relevant to the discussion, we reject this test as too simplistic under *Lyon* and other case law.

6. The Commissioner suggests that we also consider whether Bari paid an artificially inflated price. The Commissioner argues that the purchase price paid by Bari did not reflect fair market value because it was determined without reference to outstanding bank liens on the equipment. While Bari did subordinate its security interests to the bank liens, it was CIG Products which remained responsible for payments on the liens. We agree with the Tax Court that this form of "wraparound" indebtedness does not detract from the fair market value of the equipment itself. Thus, we have no reason to dispute the conclusion that the purchase price agreed to by Bari reflected the equipment's fair market value.

& *McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237, 1981 WL 11305 (1981). We disagree.

First, Coleman argues that, like the taxpayer in *Lyon*, Bari entered into this transaction because of business realities. *See Lyon*, 435 U.S. at 583–84, 98 S.Ct. at 1303–04. The parties agree that CIG Products, the seller-lessee, entered into this transaction because it needed cash to remain financially viable. Although CIG's motive appears genuine, we place little significance on this factor because Bari's motive is the relevant one.

Second, as noted, because the property's useful life would extend beyond the lease term, Coleman argues that Bari could legitimately expect to benefit from the transaction. The weight of this factor, however, is minimized here, where there was no realistic expectation of profit or loss since an investor would expect to abandon the property at the end of the lease.

■ Further, Bari obtained little equity in the equipment as a result of the transaction. Bari paid $1,900,000 as a downpayment, approximately 7.5% of the entire purchase price, with the remaining periodic payments spread over 8 years and with a final $6,500,-000 balloon payment. An owner's equity in property is generally defined as the value of the property over and above the total outstanding liens. Thus when Bari purchased the equipment, it acquired an equity in the property of $1,900,000. Bari's equity in the equipment was not affected by the outstanding $21,000,000 in liens, for which only CIG Products was liable because, in effect, Bari's debt was placed over CIG's debt in the manner of a "wraparound" mortgage.[7]

An intent to acquire equity in property is an indicator of ownership. Bari initially acquired limited equity of $1,900,000 in the equipment. During the term of the note this figure increased to the extent that Bari paid off the outstanding principal of the promissory note. However, the equity is also affected

by fluctuations in the market value of the underlying property (security). An owner does not acquire any equity in property when the outstanding debt exceeds the then existing fair market value of the property. *See Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir.1976). Here, because of the nature of the equipment, the fair market value of the property was decreasing over the term of the note. Thus Bari's initial equity in the equipment declined over the term of the note as the fair market value decreased. This declining trend further supports the conclusion that Bari was not the owner of this equipment for tax purposes.

■ Coleman asserts that it was clear error for the Tax Court to rely on the expert testimony of Withington on residual value. We believe, however, that Withington's testimony was both reliable and useful to a determination of the issue at hand. Withington's testimony was based upon three residual value studies he had actually made in 1974 and 1975. These studies involved the same type of equipment that is at issue here, and Withington extrapolated from these reports when necessary.

On the other hand, the testimony of Coleman's expert witness, Hartman, was not based on contemporary reports. Instead, Hartman testified as to what he *would have projected* in 1975. Further, Hartman testified that the broad range of residual values to which he testified ($2,467,000 to $8,580,-000) *would have likely been narrower had he actually done the appraisal in 1975.* Under these circumstances, it seems reasonable to credit Withington's testimony over Hartman's analysis.

Coleman argues that Withington's testimony cannot be used to support the decision in *Coleman I* unless it is adjusted to reflect inflation. Coleman asserts that, because the residual values found by Withington in constant 1975 dollars were compared to Bari's 1983 balloon payment, the values must be

7. A "wraparound" mortgage is a junior mortgage, the face amount of which represents the total of the existing mortgages plus the new money advanced under the wraparound mortgage. The second lender advances only the new money, but may charge interest on the total amount of the outstanding debt while agreeing to service the prior mortgages. For more discussion of wraparound mortgages, *see* Robert Kratovil & Raymond J. Werner, *Real Estate Law* 378–380 (9th ed. 1988).

adjusted to reflect inflation and the 1983 price level. However, Withington testified that his estimates adequately accounted for inflation.

> [I]n fact in my experience I've been asked this question before, the prices of the new machines incorporating new technology and manufacturing methods, have generally been inflation resistant and therefore the price of the used machines which they determine, have been inflation resistant as well.

Withington's testimony of January 28, 1985 at 293.

Withington claimed he based his conclusions on 20 years experience forecasting computer price performance, and his explanation is logical. Coleman has not presented any persuasive argument showing that it is wrong. Hence, there is no clear error in relying on Withington's estimates.

Coleman presents several other arguments purporting to undermine Withington's testimony. None of these, however, establish that the Tax Court's reliance on Withington was clearly erroneous.

> If the ... account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

■ Coleman also argues that it was an abuse of discretion to refuse to reopen the record, or at least to hold an evidentiary hearing to determine whether the record should be reopened, to examine Withington's documents. We disagree.

First, the problem seems to have been dealt with in a practical way. Before the decision in *Coleman I* became final, the court in *Coleman II* conducted an evidentiary hearing on the discovered documents. The

*Coleman II* court reaffirmed that Withington's residual value testimony was the most reliable and useful presented. The *Coleman I* court relied on the *Coleman II* hearing and decision in denying reconsideration in *Coleman I*. We think it is unnecessary now to have a hearing on the same subject before the *Coleman I* judge.[8]

■ In any event, regardless of the *Coleman II* hearing, it was within the discretion of the judge in *Coleman I* to deny the motions to reopen. A motion to reopen may be denied unless, among other requirements, the newly discovered evidence is not merely cumulative or impeaching. The evidence must also be material and of a character that would probably change the outcome of the case. *Edgar v. Finley*, 312 F.2d at 537; *Kithcart v. Metropolitan Life Ins. Co.*, 119 F.2d at 500. The Tax Court determined that the evidence offered by Coleman did not meet these requirements.

This determination is defensible on the record, and we therefore decline to find an abuse of discretion. Coleman asserts that the documents at issue were "clearly more optimistic" about the equipment's residual value than the testimony offered by Withington. This assertion appears to be little more than an attempt to cast Withington's credibility into doubt. Further, as the Tax Court explained, to the extent that Withington's credibility was material to the issues of this case, this evidence is cumulative. Similar evidence was offered at trial in an attempt to impeach Withington, and it did not change the result. Finally, the introduction of the documents would not have changed the outcome of the case. As the Tax Court notes, the shortcomings of the testimony of Coleman's own expert would have prevented him from leading the Tax Court to a different conclusion.

### B. Coleman II

*Coleman II* addressed Coleman's federal income tax deductions for 1975, and explicitly

---

8. Coleman's argument that, unlike the hearing held in *Coleman II*, the judge in *Coleman I would* have allowed testimony to rebut Withington's cross examination *if* an evidentiary hearing had been held is pure conjecture. The judge in *Coleman II* concluded that rebuttal testimony would be needlessly cumulative or irrelevant. Coleman's mere assertion that a different judge would arrive at a different conclusion does not change the substance of the proposed rebuttal testimony and does not present a basis for reversal.

adopted the findings articulated in *Coleman I*. The court reaffirmed that a 1975 investor could not have reasonably expected that the equipment's residual value would exceed the balloon payment due in 1983. Further, the Tax Court restated its belief that the residual value issue was dispositive of ownership for tax purposes and that extended discussion of other factors sometimes relevant to ownership would not be useful. Finally, the Tax Court reiterated the ultimate conclusion of *Coleman I:* Bari did not possess to a sufficient degree the burdens and benefits of ownership necessary to be considered the owner of the equipment for tax purposes.

Coleman makes a persuasive argument that the Tax Court relied on the doctrine of collateral estoppel to preclude relitigation of the issues presented in *Coleman I*. Despite disclaimers by the Tax Court, *Coleman v. Commissioner*, 60 T.C.M. (CCH) 874, 884, 1990 WL 138134 (1990), we agree that the decision to grant preclusive effect to *Coleman I* rests essentially on estoppel grounds.

■ There are three requirements for the invocation of collateral estoppel. First, there must be a final judgment in the first action. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Second, the issue implicated in the second suit must be identical in all respects to the issue decided in the first suit, with no change in the controlling facts and applicable legal rules. *Commissioner v. Sunnen*, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). Third, the issue must have been actually litigated and have been essential to the prior decision. *Id.* at 601–02, 68 S.Ct. at 721.

Although three years had passed since the opinion in *Coleman I*, the *Coleman II* court initially declined to apply collateral estoppel because no final decision (reduced to dollars) had yet been entered in that case. However, almost concomitantly the court concluded that all of the other conditions for collateral estoppel had been met and "therefore, ... [the] opinion in *Coleman I* is controlling on all issues which that case resolved pertaining to the Bari transaction." *Coleman v. Commissioner*, 60 T.C.M. (CCH) 874, 884, 1990 WL 138134 (1990). By embarking upon an examination of collateral estoppel factors and subsequently granting preclusive effect to *Coleman I* based on these factors, we believe the Tax Court applied the doctrine in spite of its disclaimers.

■ Although we agree with Coleman that collateral estoppel was in fact applied here, we do not believe that it was improperly applied. On this record we see no reason why Coleman should not be precluded from relitigating issues decided in *Coleman I*. Several of the necessary factors are not in dispute. For example, the central issue—the computer equipment's residual value—is identical in both cases and stems from the same transaction. There is no question that Coleman and the Commissioner were parties to the first case and intensely litigated this issue. Finally, there has been no intervening change in the applicable legal rules which would make the application of collateral estoppel unfair to Coleman. Only the requirement of a final decision and the need for identical controlling facts merit further discussion.

■ The absence of a final decision in *Coleman I* does not deny it preclusive effect. "[F]or purposes of issue preclusion ... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13 (1982). A decision need not be "final" in the strict sense of 28 U.S.C. § 1291 in order to prevent the involved parties from relitigating contested issues. *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). "'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir.1961), *cert. denied*, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962).

Certainly, the decision in *Coleman I* was sufficiently firm to preclude Coleman from relitigating any of the relevant issues. Only the computation of the dollar deficiency in

*Coleman I* was incomplete and this has no discernable impact on the issues with which we are concerned. Coleman had a full opportunity to litigate these issues, and the Tax Court rendered a decision which is final as to them. This should preclude relitigation. *Miller Brewing Co.*, 605 F.2d at 996.

Coleman, however, strongly contends that he was not given a "full and fair opportunity to litigate" the issues involved in *Coleman I*. *See Blonder–Tongue Lab. v. University of Illinois Found.*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). Here, Coleman relies again on the Tax Court's rulings with respect to the documents Withington failed to supply pursuant to the subpoena in *Coleman I*. Coleman suggests that the new documents make a significant change in the controlling facts of the two cases. But this argument is little more than a reiteration of Coleman's claim that the Tax Court erred in refusing to reopen the record to admit the new evidence. We are still unconvinced on this score.

■ First, Coleman argues that, because several avenues of cross-examination were denied to him since information in the new documents was not available at the time of the *Coleman I* trial, he had no opportunity to explore significant new possibilities. However, in *Coleman I*, the Tax Court said that the unproduced documents were merely cumulative and impeaching. As indicated, we believe this ruling was well within the Tax Court's discretion. A refusal to reopen the record and to admit cumulative and impeaching evidence did not deny Coleman a full and fair opportunity to litigate the issues raised in *Coleman I*. The *Coleman II* hearing on the missing documents strengthens our belief that Coleman had a full and fair opportunity to contest Withington's testimony.[9]

■ Coleman also claims he was denied a full and fair opportunity to litigate because

the *Coleman II* Tax Court did not allow rebuttal testimony after Withington's testimony at the evidentiary hearing. Although, in any event, it may be unclear why this challenge would prevent the court from recognizing the preclusive effect of *Coleman I*, we remain unconvinced that denial of rebuttal testimony was improper. As even Coleman concedes, the Tax Court has broad discretion in deciding whether to allow rebuttal testimony. *See, e.g., United States v. Mitan*, 966 F.2d 1165, 1176 (7th Cir.1992), *cert. denied*, ––– U.S. –––, 113 S.Ct. 994, 122 L.Ed.2d 145 (1993); *United States v. Chapman*, 954 F.2d 1352, 1374 (7th Cir.1992); *Gaertner v. United States*, 705 F.2d 210, 217 (7th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984). Coleman, however, persists in claiming that Withington's testimony at the hearing in *Coleman II* included new technical twists requiring the admission of rebuttal testimony.

But we do not see how Withington's testimony could have come as a surprise. Residual value and Withington's testimony about it were at the core of these two cases before the Tax Court. Withington's testimony has received exhaustive attention each time Coleman has challenged it. The Tax Court did not abuse its discretion in holding that rebuttal testimony would be needlessly cumulative.

■ In one important respect, *Coleman II* went farther than merely restating the results of *Coleman I*. In addition to adopting the conclusion that Bari could not be considered the owner of the equipment for tax purposes, the Tax Court determined that the transaction was devoid of economic substance and motivated solely by tax considerations. Based upon this finding, the court ruled that, in addition to his deficiency for the 1975 tax year, Coleman was liable for additional penalty interest as provided in § 6621(c) of the Internal Revenue Code.[10]

9. Citing *Anderson v. Cryovac*, 862 F.2d 910 (1st Cir.1988), Coleman argues that an intentional discovery failure requires a presumption that the facts of the case have been materially altered. *Anderson*, however, dealt with a request to be relieved of a final judgment under Rule 60(b)(3) of the Federal Rules of Civil Procedure and not a collateral estoppel situation. Thus, we do not

find the standards of Rule 60(b)(3) helpful in the resolution of this case.

10. The section references of *Coleman II* refer to the Internal Revenue Code of 1954, as amended, and in effect for the year in issue. Section 6621(c) imposes an interest rate of 120% of the adjusted rate of interest established by section

Coleman challenges this imposition of penalty interest. He suggests that such a course of action is inconsistent with a decision to adopt the conclusions of *Coleman I.* Coleman contends that, if the Tax Court characterized the Bari transaction as a financing agreement in *Coleman I,* it should be so characterized in *Coleman II* when penalty interest is at stake. The petitioner argues that a transaction cannot be both a financing arrangement and a transaction devoid of economic substance, motivated solely by tax considerations. A "financing agreement" does not meet the criteria for penalty interest under § 6621 of the Internal Revenue Code.

But the Tax Court called the transaction a "financing agreement" only in the context of determining that Bari could not be an owner for federal tax purposes. This reference is not necessarily inconsistent with a decision to treat the transaction as a sham devoid of economic substance. On this record, there was no error in assessing penalty interest.

Accordingly, the decisions of the Tax Court are

AFFIRMED.

6621 on substantial underpayments attributable to tax-motivated transactions.