# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2194

SCOTT C. COLE and JENNIFER A. COLE,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeal from the United States Tax Court.
No. 17275-08—**Diane L. Kroupa**, *Judge*.

ARGUED OCTOBER 22, 2010—DECIDED MARCH 28, 2011

Before KANNE, TINDER, and HAMILTON, *Circuit Judges*.

TINDER, *Circuit Judge*. Appellants Scott C. and Jennifer A. Cole (a married couple from Brownsburg, Indiana) ran into trouble with the Internal Revenue Service (IRS) in 2003, when a revenue agent began auditing their 2001 joint tax return. Through this audit, the agent discovered a web of corporate and partnership entities serving dubious purposes, undocumented financial transactions, and inconsistent reports regarding the

Coles' income. Incongruously, although Scott engineered much of the financial and legal tangle that landed him and Jennifer in hot water with the IRS, Scott is a licensed Indiana attorney with a practice focused on business planning and tax matters. We outline the confusing maze of entities and financial dealings below, but be forewarned that much of it makes little business or legal sense as the Coles fail to dispel the perception underlying the Tax Court's finding that the perplexing arrangements served as nothing but after-the-fact attempts to avoid taxation on the substantial income Scott earned in 2001.

## Background

Scott and his brother Darren T. Cole formed a partnership called the Bentley Group on February 2, 1998. Under the partnership agreement, each was entitled to an "equal share of the net profits and losses . . . unless all partners agree to a different proportion." The Cole brothers, as licensed Indiana attorneys, did business as Cole Law Offices. Scott incorporated Scott C. Cole, P.C. (SCC) on October 28, 1997, as an Indiana professional corporation. Scott filed SCC's first and only tax return for tax year 2000 on March 25, 2005. SCC was declared the 99% owner of the Bentley Group (with Darren the remaining 1% owner) in the Bentley Group's 2001 tax return, filed November 10, 2004. Scott does not explain why he purportedly divested his interest in the group (or why his brother divested all but 1% of his interest), but the only documentary evidence of the transfer is that Bentley Group 2001 tax return filed in 2004. The Indiana

Secretary of State administratively dissolved SCC on September 5, 2001, for failing to file mandated business entity reports. Scott also created JAC Investments, LLC. Scott reported on JAC's 2001 tax return that Jennifer Cole owned 50% of JAC and her family trust owned another 49%. Scott reported owning the remaining 1%, yet he generated all of JAC's income from legal services he performed independent of the Bentley Group.

The Bentley Group's operations appeared to hum modestly along prior to 2001. Darren managed the practice; his wife Lisa worked as a paralegal. As noted above, Scott's practice involved business planning and taxation. He created limited liability companies, prepared corporate and individual tax returns, and represented clients before the IRS. The trio had signature authority over the group's checking account. Scott and Darren agreed to deem withdrawals beyond amounts earned as borrowed money. In 1999, the group reported total income at $46,121 and deductions of $46,609 (including rent, repairs, and maintenance and other business-related deductions) for an ordinary income loss of $488. In 2000, the group reported $69,698 in total income and $68,393 in deductions for an ordinary income gain of $1,305. This unexceptional pattern of business changed drastically in 2001.

From one perspective, 2001 was the group's banner year financially. Yet the Coles' bungled management of their revenue bonanza turned their partnership's good fortunes into a fiscal calamity. A substantial portion of the 2001 revenue—a whopping $1.2 million—came from

the group's biggest client: the co-trustees of the George Sandefur Living Trust. Trustees Constance J. Gestner and Terri L. Haynes made four payments of $300,000 between June 18, 2001, and July 5, 2001, for Scott's legal services for the trust. The trustees made the first check payable to "Scott Cole and Associates" and the other three checks payable to "Cole Law Office." All four checks were deposited into the Bentley Group's account. Gestner signed an affidavit on April 12, 2005, stating that the trustees "retained Scott Cole as the Attorney to represent the Trust and to help us with any and all Trust and Estate matters." The affidavit states that she was "fully advised by Scott Cole that his Attorney's fee would exceed the usual and ordinary maximum fee for legal services of an unsupervised administration of an estate of ten percent (10%)," that she consented to Scott's $1.2 million fee, and that she was "very satisfied with the legal representation of Scott Cole." For tax year 2001, the Bentley Group reported $1,583,900 in gross receipts and ordinary income with no deductions. Despite Scott's financial windfall in 2001, he filed for bankruptcy in 2002, but in that proceeding failed to disclose any interest in the Bentley Group, Cole Law Offices, or any other law practice. As noted above, tax year 2001 was the year the Cole brothers maintained to the IRS that they transferred 99% of their ownership interest in the Bentley Group to Scott's professional corporation SCC (which also became defunct in 2001). But don't forget that the Bentley Group's 2001 return wasn't filed until near the end of 2004, well after the Coles learned that an audit was underway. The timing of

this financial sleight of hand did not go unnoticed by the IRS or by the Tax Court judge.

The IRS began auditing the Coles' 2001 joint return in 2003. After meeting with Scott fairly early in the audit process, the IRS learned of the brothers' involvement with the Bentley Group and the investigation expanded to include Darren and Lisa's 2001 joint tax return. The IRS was not favorably impressed with the Bentley Group's belated 2001 tax return. Although the 2001 return reported Darren with a 1% interest and SCC with a 99% interest in the Bentley Group, the return also reported no "distribution of property or a transfer . . . of a partnership interest during the tax year." The Bentley Group's 2000 return declared each Cole brother as a 50% owner of the group. The Cole brothers did not file employment tax returns or report the purported divestment of their Bentley Group interest on their respective joint tax returns filed with their spouses. Although the Bentley Group's 2001 return was not filed until November 2004, SCC did not exist as of September 5, 2001, and never filed a 2001 return.

Scott and Jennifer's 2001 joint tax return reported $100,358 in total income and $100,276 in adjusted gross income. Through various deductions, exemptions, and credits, they took their reported taxable income down to $18,265 with a tax liability of $505. Both Scott and Jennifer signed the self-prepared return on April 11, 2002. Yet in 2001, Scott withdrew $1,173,263 from the Bentley Group's bank account. Darren and Lisa withdrew $198,308. Despite the lack of documentation, Scott and

Jennifer argue that Scott's withdrawals were "investment loans" from the Bentley Group. For example, Scott made or authorized transfers of $340,000 and $300,000 to J&D Investments, LLC. Scott also "invested" $150,000 in Larkin Investments, LP. Testimony at trial indicated that both companies were managed by Scott's friends. Scott also loaned $10,000 to his brother Mark Cole for Mark's roofing company. Scott also loaned $125,865.50 to MR Parts, LLC (operated by Scott's church colleagues) and $10,400 to Houses Restored to Homes, LLC (managed by Scott's father). Scott also gave his mother $50,000 from the Bentley account to invest in MR Parts. Scott loaned his father $40,000 from the Bentley account and told his father to pay him back by giving $40,000 to Scott's church in Scott's name. Scott and Jennifer claimed a $40,000 charitable deduction yet did not report any of that money as taxable wages or self-employment income.

The IRS auditors discovered separate from the Bentley Group that JAC had total deposits of $95,446 in 2001. Nearly all of the deposits were checks made out to Scott, not JAC. The IRS determined that only $15,794 was nontaxable, but the Coles only reported self-employment tax on $1,162 of JAC's income. Scott also deposited $79,294 into Jennifer's checking account in 2001, of which $59,264 was from Scott's legal practice. This money paid for school tuition, music lessons, and residential landscaping. None of these deposits were reported as income.

Because the Coles did not maintain adequate books and records, IRS auditors reconstructed their 2001 earnings

by employing two well-established indirect methods of identifying a person's income. The first was the "specific items" method, which examines evidence of specific amounts of a taxpayer's unreported taxable income, such as the Coles' withdrawals from the Bentley Group's bank account and other sources. *See United States v. Medel*, 592 F.2d 1305, 1314 n.8 (5th Cir. 1979); 35A Am. Jur. 2d Federal Tax Enforcement § 1208. Second, the IRS performed a "bank deposits" analysis of the Coles' income from other sources. This method assumes that all money deposited in a taxpayer's account in a certain period constitutes income, taking into account known nontaxable sources and deductible expenses. *See Clayton v. Comm'r*, 102 T.C. 632, 645 (1994) (citing *DiLeo v. Comm'r*, 96 T.C. 858, 867 (1991), *aff'd* 959 F.2d 16 (2d Cir. 1992)); *Estate of Mason v. Comm'r*, 64 T.C. 651, 656 (1975) (citing *e.g., Boyett v. Comm'r*, 204 F.2d 205 (5th Cir. 1953)); 35 Am. Jur. 2d Federal Tax Enforcement § 860.

On April 11, 2008, the IRS mailed Scott and Jennifer a deficiency notice. The Commissioner ultimately determined that Scott and Jennifer omitted $1,215,183 in income and $1,329,268 in self-employment income from their 2001 return after allocating Bentley Group-related income between Scott and Darren. The Commissioner assessed a $556,187 income tax deficiency and a $417,140 fraud penalty against Scott and Jennifer. The Commissioner also charged Darren and Lisa with a $102,227 income tax deficiency and a $76,670 fraud penalty. Scott and Jennifer petitioned the Tax Court for relief on

July 14, 2008, and their case was consolidated with Darren and Lisa's case.

After a trial, the Tax Court found that Scott and Jennifer understated their 2001 income. *Cole v. Comm'r*, T.C.M. 2010-31, 2010 WL 610701 (Feb. 22, 2010). The court found that the Coles could not avoid tax liability by merely assigning their income to others. All of the money deposited into the Bentley Group's account was allocated to the Cole brothers by the court because of the lack of credible evidence supporting the claim that the brothers assigned the group's income to SCC or that they were not the group's partners. The decision also determined that the Cole brothers failed to maintain adequate records of their income, thus justifying the Commissioner's indirect reconstruction of their incomes. The court found the Commissioner's reconstruction of the Coles' income (using the specific items and bank deposits methods) to be reasonable and substantially accurate and that the Coles failed to produce credible evidence showing otherwise. The court also found that "clear and convincing" evidence supported its finding that the Coles' underpayment was due to fraud and that the Coles failed to show that any portion was not due to fraud. The court found "that Scott and Jennifer used a scheme where they assigned income to an LLC to conceal the true nature of the earnings subject to income and self-employment taxes." The Tax Court entered a final decision against the Coles on February 23, 2010, assessing a $556,187 deficiency and a $417,140 fraud penalty against Scott and Jennifer for tax year 2001. The court also assessed a $102,227

deficiency and a $76,670 fraud penalty against Darren and Lisa for tax year 2001. Only Scott and Jennifer Cole appealed.[1]

## Analysis

The Coles' 71-page brief identifies 15 issues for review in a scattergun approach that does not serve them well. *See United States v. Lathrop*, No. 10-1099, 2011 WL 710469, at *4 (7th Cir. Mar. 2, 2011) (noting that presenting "nearly a dozen sources of error, effectively ignoring our advice that the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis" (citations omitted)). The brief contains no discussion of the standard of review, few citations to authority, generally no citation to evidence aside from their own trial testimony, and by and large fails to contain an argument beyond generalized assertions of error. The Coles' arguments predominantly consist of a series of items the Tax Court supposedly overlooked. Repeatedly they support their arguments by stating that the IRS "does not know" something about their financial arrangements. A litigant's "brief must contain an argument consisting of more than a generalized assertion of error, with citations to supporting authority." *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). Appellants must set forth in their

---

[1] "The Coles" from this point on in our opinion refers to Scott and Jennifer unless otherwise noted. We do not discuss the Tax Court ruling on the liability of Darren and Lisa.

brief "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A). Complete failure to comply "with Rule 28 will result in dismissal of the appeal." *Anderson*, 241 F.3d at 545-46 (citing *McCottrell v. EEOC*, 726 F.2d 350, 351 (7th Cir. 1984)). We ascertain two issues addressed in a manner beyond a mere generalized assertion of error precluding their appeal's dismissal: (1) whether the Tax Court erred in finding that the Coles omitted income from their 2001 joint tax return, and (2) whether the Tax Court erred in imposing a fraud penalty. Pursuant to our well-established precedent, the Coles' other underdeveloped " 'skeletal' arguments," if not specifically discussed herein, are deemed waived. *Hernandez v. Cook Cnty. Sheriff's Office*, No. 10-1440, 2011 WL 650752, at *5 (7th Cir. Feb. 24, 2011) (citation omitted).

We also note that Scott, a licensed attorney, represented himself on appeal. Although Scott does not expressly ask for special treatment as a *pro se* litigant in his brief, at argument he hinted that his *pro se* status should be considered. We note that *pro se* litigants who are attorneys are not entitled to the flexible treatment granted other *pro se* litigants. *Lockhart v. Sullivan*, 925 F.2d 214, 216 n.1 (7th Cir. 1991) (citation omitted); *Socha v. Pollard*, 621 F.3d 667, 673 (7th Cir. 2010) (citation omitted). But Jennifer is also an appellant and *pro se* litigants may not represent their spouse, or anyone else, on appeal. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 402 (7th Cir. 2010) (dismissing a plaintiff's husband from a lawsuit because the plaintiff purported to represent him *pro se*

(citations omitted)). Because Jennifer did not sign the Coles' opening (and only) brief prior to argument, we were prepared to dismiss her appeal. We informed Scott of this at oral argument on October 22, 2010. The Coles moved to amend their brief's signature page to add Jennifer's signature on November 8, 2010. We granted the motion on November 12, 2010, allowing Jennifer's *pro se* appeal to proceed along with Scott's, but the brief and argument demonstrated that Scott structured the appellate presentation on their behalf.

## A. The Coles' omission of income

There are two layers to the standard governing our review of the Tax Court's finding that the Coles omitted income from their 2001 joint tax return. First, we have long held that "the Commissioner's tax deficiency assessments are entitled to the 'presumption of correctness.' This presumption imposes upon the taxpayer the burden of proving that the assessment is erroneous." *Pittman v. Comm'r*, 100 F.3d 1308, 1313 (7th Cir. 1996) (quoting *Gold Emporium, Inc. v. Comm'r*, 910 F.2d 1374, 1378 (7th Cir. 1990)). To rebut the presumption of correctness and shift the burden to the Commissioner, the Coles "must demonstrate that the Commissioner's deficiency assessment lacks a rational foundation or is arbitrary and excessive." *Pittman*, 100 F.3d at 1313 (citing *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir. 1987)). The Coles could do this by demonstrating that the Commissioner failed to make an evidentiary showing or failed to present evidence linking them to the "alleged

unreported income." *Pittman*, 100 F.3d at 1313. Second, we limit our review of factual conclusions to "whether the tax court was 'clearly erroneous.'" *Coleman v. Comm'r*, 16 F.3d 821, 825-26 (7th Cir. 1994) (quoting *Nickerson v. Comm'r*, 700 F.2d 402, 405 (7th Cir. 1983)). A factual finding "can be reversed as clearly erroneous only when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Coleman*, 16 F.3d at 826 (quoting *Anderson v. Bessemer*, 470 U.S. 564, 573, (1985)). Of course, we review questions of law de novo. *Pittman*, 100 F.3d at 1312. But because the Coles do not, for the most part, raise errors of law, and focus instead on the factual finding of whether they omitted income from their 2001 joint tax return, our review of that finding is governed by the clearly erroneous standard.

Basic principles of tax law underlie this case. I.R.C. § 61(a)(1)-(2) states:

> Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
>
> (1) Compensation for services, including fees, commissions, fringe benefits, and similar items; [and]
>
> (2) Gross income derived from business; . . . .

Another thirteen examples follow § 61(a)(1)-(2), further refining the Internal Revenue Code's broad definition of "gross income." In *Comm'r v. Glenshaw Glass Co.*, 348

U.S. 426 (1955), the Supreme Court held that Congress used such language to define gross income (with somewhat different wording and under a different section) "to exert in this field 'the full measure of its taxing power.'" *Id.* at 429 (citations omitted). Thus, "the Court has given a liberal construction to this broad phraseology in recognition of the intention of Congress to tax all gains except those specifically exempted." *Id.* at 430 (citations omitted). Starting at I.R.C. § 101, the Code lists dozens of items specifically excluded from the definition of gross income, including "Certain death benefits," "Gifts and inheritances," "Interest on State and local bonds," and "Compensation for injuries or sickness." *See* I.R.C. §§ 101, 102, 103, and 104. The Coles do not raise an exception or argue that the money they earned in 2001 is not gross income. Their dispute with the IRS (and the Tax Court decision) is about whether they or some other entity actually earned the income in question.

The Coles' 2001 joint tax return reported adjusted gross income of $100,276, taxable income of $18,265, and a tax liability of $505. Yet, the Coles have produced no records supporting these figures. The evidence presented to the Tax Court showed that the Coles actually made a tremendous amount of money in 2001 that they did not report on their 2001 joint return. Scott, via his representation of the Sandefur Trust and others, helped the Bentley Group earn $1,430,802 in taxable deposits in 2001 as determined by the IRS and found by the Tax Court. Scott also made a decent amount of money independent of the Bentley Group as documented by the $79,652 in taxable deposits in JAC's bank account, all

from Scott's legal services. Yet Scott only reported self-employment tax on $1,162 of income for a self-employment tax liability of $164.

The Coles do not directly challenge the presumption of correctness granted the Commissioner's deficiency assessment or our clearly erroneous standard for reviewing the Tax Court's factual findings. Internal Revenue Code section 6001 requires taxpayers to "keep such records, render such statements, make such returns, and comply with such rules and regulations" as required by the Commissioner. When a taxpayer fails to regularly use an accounting method, "or if the method used does not clearly reflect income," I.R.C. § 446(b) allows the Commissioner to determine taxable income via a method that in its discretion "does clearly reflect income." *See Webb v. Comm'r*, 394 F.2d 366, 371-72 (5th Cir. 1968) (holding that because a taxpayer's "records did not clearly reflect his income, the Commissioner was authorized to use such methods as in his opinion clearly reflected that income" (citing 26 U.S.C. § 446(b)); *Factor v. Comm'r*, 281 F.2d 100, 117 (9th Cir. 1960) (holding that an "undisputed rule is that, because of the failure of the taxpayer to keep books clearly reflecting his income, the Commissioner had the right to compute the income" using a method the Commissioner believes accurately reflects income (citations omitted)). Courts have long approved of the "bank deposits" and the "specific items" methods. *See United States v. Merrick*, 464 F.2d 1087, 1092 (10th Cir. 1972) (affirming a tax evasion conviction—challenged on sufficiency of the evidence—that was established by the specific items method); *United States v. Stein*, 437 F.2d 775,

779-81 (7th Cir. 1971) (holding that a tax evasion conviction could be proved on "a bank deposits analysis" (citations omitted)). The reconstruction of a taxpayer's income need only be reasonable in consideration of the case's circumstances and facts. *See Bradford v. Comm'r*, 796 F.2d 303, 306 (9th Cir. 1986). The Commissioner's reconstruction of the Coles' income shows that they omitted $1,215,183 of income and $1,329,268 of self-employment income from their 2001 return. The Coles failed at the Tax Court to rebut the assessment's presumption of accuracy and fail on appeal to show clear error in the court's finding that because the Coles did not produce credible documentary or other evidence showing otherwise, the Commissioner's reconstruction was "reasonable and substantially accurate."

Instead, the Coles argue that Scott did not actually earn the money; rather, the Bentley Group earned the money. Against nearly all the evidence, Scott argues that he suddenly stopped owning part of the Bentley Group on January 1, 2001. Scott alleges, without any contemporary documentary evidence, that he divested his Bentley ownership by assigning it to SCC in spite of the evidence that Scott directed more than $1 million of the Bentley Group's funds to other entities and persons in 2001. The Coles also cite Jennifer's purported 50% passive ownership of JAC along with her family trust's purported 49% ownership. According to the Coles, they only owed tax on the 1% of JAC that Scott owned. These arguments fail on several levels.

The Coles fail to show that the Tax Court clearly erred in finding (1) that there is insufficient evidence showing

SCC's ownership in the Bentley Group and (2) that Scott and Darren were the only Bentley Group partners in 2001. The only documentary evidence of SCC's alleged Bentley Group partnership status was the group's 2001 return. This return was filed in November 2004—long after the Cole brothers became aware that the IRS audit had begun. This return also indicates that during 2001 there was no "distribution of property or a transfer . . . of a partnership interest." Not only are the timing and internal inconsistencies of the Bentley Group's 2001 return suspect given the dramatic increase in the Bentley Group's reported income in 2001 (from $46,121 in 1999, $69,698 in 2000, to $1,583,900 in 2001), SCC failed to file a return for 2001 (thus, paying no income tax) and became a defunct entity in 2001. We find no clear error in the Tax Court's finding that "[t]here is no written evidence for 2001 to suggest that SCC was involved with the Bentley Group." Nor was the Tax Court clearly in error to find that the Cole brothers' testimony offered to support their after-the-fact explanation of SCC's ownership of Bentley lacked credence. The Coles argue that because Darren signed the Bentley Group's 2001 tax return and the questions on the return were presented to the Bentley Group, the omission of a property distribution or transfer does not show "that a transfer of ownership interest . . . did not occur." The Coles also argue that SCC's administrative dissolution was simply "[d]ue to an oversight." These excuses fail to show that the Tax Court clearly erred in finding that the Coles did not rebut the presumption of correctness as to the IRS's determination that the money deposited

into the Bentley Group's account was "income allocated to Scott and Darren, not SCC."

The Coles' excuses and justifications aside, the Commissioner presented sufficient evidence showing Scott's ownership in the Bentley Group. The Bentley Group did business as "Cole Law Offices," without mentioning the existence of a corporate partner. Indiana Rule of Professional Conduct 7.5(b) at the time prohibited (it has since been modified) lawyers from practicing "under a name that is misleading as to the identity, responsibility, or status of those practicing thereunder." The Bentley Group's tax returns for 1999 and 2000—filed before the audit began—list Darren and Scott as the owners. Bentley Group clients wrote checks to Cole Law Offices in 2001. A $300,000 check, made out by the trustees of the Sandefur Trust to "Scott Cole and Associates" on June 18, 2001, was deposited into the Bentley Group's bank account. Even at trial, the Cole brothers could not keep their answers about the Bentley Group's ownership consistent.

> [Attorney for the Commissioner] Did you practice law in partnership with your brother under the name Bentley Group, DBA Cole Law Offices during the year 2001?
>
> [Darren] Yes.

Scott later cross-examined Darren on the issue.

> [Scott] Okay, now you had mentioned that in the year 2001 you did not practice law or you were not a partner with anyone but Scott Cole. Did you

mean Scott Cole or Scott Cole professional corporation?

[Darren] I guess it would be the corporation. When, you know, you're thinking as far as Disciplinary Commission wise or whatever, I thought of you personally as my partner, on paper Scott Cole PC was the partner.

[Scott] So in the year 2000, who were the partners with Cole Law Offices?

[Darren] Myself and Scott Cole PC.

[Scott] Okay, in the year 2000?

[Darren] Oh, myself and you.

[Scott] Okay, and then in 2001, who were the partners?

[Darren] Myself and Scott Cole PC.

The Coles do not show how the Tax Court clearly erred in finding that Scott did not divest his Bentley Group interest in 2001 or that Scott earned the vast majority of the Bentley Group's 2001 income (which thus should be allocated to him) as evidenced by the fact that he directed the withdrawal of $1,173,263 from the group's account. The Coles argue that the Tax Court erred by finding that Scott misreported his interest in the Bentley Group in his 2002 bankruptcy filing. They argue, despite the lack of evidence, that his filing was consistent with the Bentley Group's 2001 return and the purported divestment of his Bentley Group ownership, and that he did not disclose SCC because it was dissolved on

September 5, 2001. This spurious argument only accents the game of thimblerig[2] suggested by Scott's legal and financial maneuvering. It goes something like this. Scott did not earn any of the Bentley Group-related income in 2001. Look to the Bentley Group, it earned the income from Scott's legal work. Isn't Scott a Bentley Group partner? No, Scott disclaimed the entirety of his Bentley Group partnership in 2001, and now his personal corporation SCC is the primary owner of all but 1% of the Bentley Group. But wait, don't look to Scott to claim any interest in SCC because SCC disappeared on September 5, 2001, along with, poof!, apparently any obligation Scott believed he had to pay taxes on his 2001 financial windfall. As Darren testified at trial, SCC was at best a Bentley Group partner "on paper" (the paper consisting only of a tax return created after the audit began), but in reality Scott never ended his Bentley Group partnership. Because the Coles do not show how the Tax Court's findings of fact as to the Bentley Group ownership were clearly erroneous, they are dispositive of the arguments that the Bentley Group income was not attributable to the Coles.

Ignoring the clearly erroneous standard of review for factual findings such as the ownership of the Bentley Group, the Coles argue that the Tax Court lacked juris-

---

[2] Thimblerig is a game "played with three small cups shaped like thimbles and a small ball or pea that is so quickly shifted from under one cup to under another that the person watching is often misled." Webster's Third New International Dictionary 2375 (1986). Often the game functions "as a swindling operation." *Id.*

diction over the Bentley Group. The Coles' theory is the Bentley Group is not a relevant party because the group's 2001 tax return did not list either Scott or Jennifer as Bentley Group partners. Only Darren Cole and SCC were listed as partners. Because Scott and Jennifer were not listed as partners, they contend that they were somehow surprised when the IRS attributed partnership income to them. This lack of notice, the argument goes, prevented the Coles from presenting evidence regarding their tax liability for the group's income. This argument lacks citation to authority. The Coles do not explain what type of notice was necessary to substantively make a difference. And the Coles had notice that the IRS would find Scott at least partially liable for Bentley Group income because the April 11, 2008, deficiency notice attributed the group's income to the Coles. Most importantly, the Coles do not show how the Tax Court clearly erred in finding that Scott was in fact a Bentley Group partner in 2001.

Even if Scott had effectively documented his purported divestment of his Bentley Group interest, the divestment lacked economic substance as demonstrated by his continuous dominion and control over the group's assets for personal purposes. Under the assignment of income doctrine, taxpayers may not shift their tax liability by merely assigning income that the taxpayer earned to someone else. *Kenseth v. Comm'r*, 259 F.3d 881, 884 (7th Cir. 2001) (citing *Lucas v. Earl*, 281 U.S. 111, 114-15 (1930); *United States v. Newell*, 239 F.3d 917, 919-20 (7th Cir. 2001)). In *Lucas*, the Supreme Court held that a taxpayer's salary may not escape tax "by anticipatory arrangements

and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." 281 U.S. at 114-15. Tax law makes "no distinction . . . according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew." *Id.* at 115. In *Griffiths v. Helvering*, the Court refused to allow "the refinements of title" to determine a taxation issue and focused instead on the "actual command over the property taxed." 308 U.S. 355, 357 (1939) (quoting *Corliss v. Bowers*, 281 U.S. 376, 378 (1930)). The Court held that "a lawyer's ingenuity devised a technically elegant arrangement" that created "an intricate outward appearance . . . to the simple sale . . . and the passage of money." *Griffiths*, 308 U.S. at 357.

Scott never gave up control of the Bentley Group or its funds as demonstrated by his transferring $1,173,263 in Bentley Group money in 2001. The Coles claim that some of these transfers were investment loans, but they do not explain why Scott gave his mother Bentley Group money and loaned his father $40,000 of Bentley Group funds. The Coles argue that they did not receive any personal benefit from these transactions. But they do not explain how they could not have benefitted when Scott's father gave Scott's church $40,000 and then Scott claimed a $40,000 charitable deduction on the Coles' personal tax return without ever reporting the money as income. As found by the Tax Court, Scott acknowledged that as an attorney he earned income from providing legal services but thought he could avoid

reporting that income by depositing that money into the Bentley Group account and assigning his Bentley Group interest to SCC. The Coles fail to show that the court clearly erred in finding that Scott may not avoid tax liability on his income by assigning it to SCC when substantively his Bentley Group ownership never changed as evidenced by Scott's continued dominion and control over the partnership's funds. *See Trousdale v. Comm'r*, 219 F.2d 563, 567 (9th Cir. 1955) (affirming the Tax Court's finding that "the transaction was not in substance and effect the sale of a partnership interest").

The Coles' argument that they did not benefit from the loans is frivolous because "gross income means all income from whatever source derived, including . . . [c]ompensation for services." I.R.C. § 61(a)(1). Even if the Coles provided genuine documentation as to the loans (providing information such as the loans' terms or interest rates) and we were inclined to view them as bona fide loans, Scott would still owe taxes on the income because before he loaned the money, he incurred an undeniable accession to this wealth, clearly realized it, and exercised dominion over it. *See Glenshaw Glass Co.*, 348 U.S. at 431. A majority of the Bentley Group's income came from the Sandefur Trust for legal representation undoubtedly performed by Scott. Regardless of whether this was an inadvertent error, the first of the four checks was made out to "Scott Cole and Associates," indicating that the trustees intended to pay Scott for his legal services. As previously noted, co-trustee Gestner signed an affidavit that was included among

the documents before the Tax Court declaring that the trustees "retained Scott Cole as the Attorney to represent the Trust." The fee Scott Cole charged—not the Bentley Group or Cole Law Offices—exceeded the usual fee for such legal services, but Gestner was "very satisfied with" Scott's legal representation, considering his $1.2 million fee to be worthwhile. Another document presented in the Tax Court was a motion before the Shelby County, Indiana, Circuit Court signed by Scott declaring that "Scott Cole worked in his legal capacity to quash any attempt to contest the" trust, among other matters. Scott exercised control over the fees by having the money deposited into the Bentley Group account and then moving $1,173,263 of Bentley Group money in 2001 to other persons and entities. The Coles' attempt to avoid paying taxes on this income by declaring that they did not benefit from the loans and thus somehow assigned the income is a nonstarter. *See United States v. Basye*, 410 U.S. 441, 447-48 (1973) (noting that two familiar principles of income taxation are "first, that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory assignment of that income, and, second, that partners are taxable on their distributive or proportionate shares of current partnership income irrespective of whether that income is actually distributed to them"); *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 403-04 (1972) (noting that it is "well established that income assigned before it is received is nonetheless taxable to the assignor"); *Comm'r v. Sunnen*, 333 U.S. 591, 604 (1948) ("As long as the assignor actually earns the income or is other-

wise the source of the right to receive and enjoy the income, he remains taxable.").[3]

The Coles also do not show how the Tax Court clearly erred in finding that the Coles omitted other income, namely, the funds deposited into accounts held by JAC Investments and Jennifer Cole. The Coles do not explain their failure to report $79,294 in deposits into Jennifer Cole's personal checking account, including $59,264 in legal fees earned by Scott. We do not find clear error in the Tax Court's finding that the Coles failed to report these deposits as income.

JAC reported gross receipts of $146,957 in 2001 (with $28,647 in unsubstantiated expenses), yet Scott only reported $1,162 in income for self-employment tax purposes in 2001 and Jennifer reported none at all. The Coles' theory for the tax treatment of this income is that Jennifer owned 50% and her family trust 49% as members. Scott conveniently owned only 1% as a member-manager who ran JAC's day-to-day operations. Yet, as noted above, the assignment of income doctrine prohibits taxpayers from shifting their tax liability by simply assigning income that the taxpayer earned to someone else. *Kenseth*, 259 F.3d at 884. The deposits into JAC's account were almost exclusively checks written to

---

[3] The IRS and the Tax Court allocated the vast majority of the 2001 Bentley revenues to Scott rather than splitting them equally with Darren as the partnership agreement stated. This is consistent with the manner in which Scott controlled the subsequent disbursement of those funds, and is not clearly erroneous.

Scott. And the Coles used the JAC money for personal reasons, such as church tithing and mortgage payments. The Tax Court's finding of fact that the Coles "avoided income and self-employment taxes by assigning income from Scott's law practice to JAC and using those funds for personal purposes" was not clearly erroneous.

The Coles raise another jurisdictional argument that bears little mention but we will address it anyway. The Coles argue that the Tax Court erred in taking jurisdiction over JAC Investments because the Commissioner failed to apply the 1982 Tax Equity and Fiscal Responsibility Act (TEFRA) audit and litigation procedures, *see* I.R.C. §§ 6221-6234, namely by not sending JAC's partners a Notice of Final Partnership Administrative Adjustment. This argument lacks merit. Internal Revenue Code section 6231(g)(2) permits the Commissioner to find that TEFRA does not apply to a partnership based on its tax return. Scott answered "no" to the question on JAC's 2001 return asking whether JAC was subject to TEFRA. The Coles' attempt to raise TEFRA, when Scott expressly stated that JAC was not subject to TEFRA, is misguided.

Because none of the Tax Court's findings as to the Coles' unreported income from 2001 were clearly erroneous, we affirm the court's finding that the Coles omitted $1,215,183 of income and $1,329,268 of self-employment income from their 2001 joint tax return.[4]

---

[4] The Coles argue that the Tax Court erred in allowing Revenue Agent Loretta Reed to testify without giving the

(continued...)

**B. The imposition of the fraud penalty**

We next address the Tax Court's finding that the Coles were liable for the fraud penalty. If any portion of an "underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the under-payment which is attributable to fraud." I.R.C. § 6663(a). Unlike the assessment of unreported income, courts do not presume the existence of fraud; rather, the Commissioner carries the burden of proving "by clear and convincing evidence that" an underpayment of taxes "was due to fraud." *Toushin v. Comm'r*, 223 F.3d 642, 647 (7th Cir. 2000) (citing I.R.C. § 7454(a); *Pittman*, 100 F.3d at 1319). If the Commissioner proves "that any portion

---

(...continued)

Coles notice and that she used notes during her testimony. These claims are without merit. The Coles do not show why Reed's use of notes constitutes error. The Coles also had notice. The Commissioner's pretrial memorandum declared an intent to call a revenue agent, which at the time was Jeffrey Nichols. The Commissioner wanted him to discuss the Cole couples' lack of cooperation and the indirect methods of reconstructing their income. At trial, Darren requested the Commissioner call Reed to discuss Darren and Lisa's alleged lack of cooperation. The Coles (all four of them) received notice from the IRS on May 26, 2009, indicating "that it is possible to have Revenue Agent Loretta Reed available for trial." Reed did not testify until June 18, 2009, giving the Coles ample notice. Scott and Jennifer also fail to show how Reed's testimony caused them prejudice.

of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud." I.R.C. § 6663(b). The fraud determination turns on whether the taxpayer "had an actual, specific intent to evade a tax" owed. *Stephenson v. Comm'r*, 79 T.C. 995, 1005 (1982), *aff'd*, 748 F.2d 331 (6th Cir. 1984) (per curiam). Rarely does direct evidence exist of a taxpayer's fraudulent intent. *Toushin*, 223 F.3d at 647. But "the IRS may establish fraudulent intent through circumstantial evidence." *Id.* Like our review of the findings regarding the Coles' unreported income, a tax court's fraud determination is a finding of fact that "will not be set aside unless clearly erroneous." *Id.* (quoting *Pittman*, 100 F.3d at 1319).

In *Spies v. United States*, 317 U.S. 492, 499 (1943), the Supreme Court noted that:

> Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner". By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books

or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

Courts have expanded these examples to include the understatement of income, failure to file tax returns, and implausible or inconsistent explanations of behavior. *Bradford*, 796 F.2d at 307 (citations omitted). Commingling assets in an attempt to avoid tax liability, filing late tax returns, and failure to maintain adequate personal or corporate business records have also been cited as indications of fraud. *United States v. Walton*, 909 F.2d 915, 926 (6th Cir. 1990). Courts also consider relevant the taxpayer's education, intelligence, and tax expertise in determining fraudulent intent. *See id.* at 927; *Stephenson*, 79 T.C. at 1006.

The Tax Court found the Coles liable for the fraud penalty citing a variety of factors, or "badges of fraud," to show that the Commissioner proved with clear and convincing evidence that Scott and Jennifer fraudulently understated their 2001 tax liabilities. These findings were not clearly erroneous.

The court started with the Coles' education and intelligence as illustrated by Jennifer's prior work as an accountant after earning a college degree and Scott's attorney's license, oath to uphold the law, and his legal practice that included tax law and preparing tax returns. The Coles cannot claim to be unsophisticated or unknowledgeable of the Code's principles. Thus, we

reject their claim that the Tax Court used "acts of negligence to show fraud," particularly considering the number of improper acts identified by the Tax Court.

The Tax Court's finding that the Coles omitted $1,215,183 of income and $1,329,268 of self-employment income from their 2001 joint tax return is a longstanding sign of intent to evade taxation. *See Spies*, 317 U.S. at 499 (noting that "covering up sources of income" allows an inference of "affirmative willful attempt" to evade); *Bradford*, 796 F.2d at 308 (failing to report taxable income supported a fraud finding). Intensifying this indication of fraud is that Scott's attempt to avoid tax liability for his 2001 windfall took the form of an elaborate shell game through which Scott attempted (although ineptly) to use his knowledge of tax matters to place the income in a defunct entity purportedly free of tax responsibilities. *See Walton*, 909 F.2d at 926 (noting that "implausible explanations of conduct" is "a strong indication of fraud").

Failing to maintain accurate records "is a strong indicum of fraud with intent to evade taxes." *Toushin*, 223 F.3d at 647 (quoting *Estate of Upshaw v. Comm'r*, 416 F.2d 737, 741 (7th Cir. 1969)). The Tax Court found that although Scott claimed that he diverted most of his income from his Bentley Group-related legal fees to others ostensibly as loans, the transactions lacked documentation. The Coles also failed to document the alleged transfer of the Bentley Group interest to SCC or his deposits into the Bentley Group account. The lack of records also supported the Tax Court's finding that Scott failed to respect "the existence of different entities or the partners in the

Bentley Group." The Coles' defense is that the records were "lost or misplaced or discarded due to the passage of time" and that an August 19, 2005, storage building fire consumed "many of the records of the Bentley Group." Regardless of these excuses, Scott testified that he did not retain billing invoices or save the papers he used to prepare his tax returns. And the IRS began auditing their 2001 tax return in 2003, well before the 2005 fire and not long after the Coles filed their joint 2001 income tax return on April 11, 2002. The Coles also do not elaborate on what records they would produce but for the fire or why they did not attempt to re-produce the records. Nor do they explain why the loan recipients did not have records of the transactions or why the Coles did not keep at least some of the records in Scott's home office. And some documents survived as evidenced by the inclusion in the Tax Court record of the Bentley Group partnership agreement and hand-written minutes from an October 5, 1999, meeting of "Cole Law Offices" partners Darren and Scott Cole. The Tax Court's finding that the absence of records suggested fraud was not clearly erroneous.

The Coles also commingled business and personal assets. Scott deposited some of his earnings from his legal practice into the JAC account and Jennifer's personal account. Jennifer wrote checks from these accounts to pay for personal expenses, such as school tuition, land-scaping, and music lessons. Scott also withdrew $1.17 million from the Bentley Group in 2001 and loaned it to friends and family. The Tax Court did not clearly err in finding that Scott "showed little respect for business

formalities and effectively made the Bentley Group nothing more than a checking account."

The Coles also concealed assets by funneling income into multiple business entities that lacked any business purpose. The entities served, as found by the Tax Court, "as conduits to hide income Scott earned from providing legal services and preparing tax returns." Instead of reporting the income from his law practice, Scott attempted (after the IRS audit began) to assign his interest in his law practice to his personal corporation (for which he disclaimed all but 1% of the ownership) that later that year became defunct. This scheme, as found by the Tax Court, was an attempt to "conceal the true nature of the earnings subject to income and self-employment taxes." Scott also misrepresented his occupation (and thus his source of income) by stating on the Coles' 2001 return that he was an investor. Scott directed his income through several entities he undoubtedly controlled. By attempting to minimize his ownership, Scott thought he could report only $505 in tax liability despite earning more than $1.2 million in tax year 2001. This scheme, given Scott's apparent knowledge of tax and business planning matters, is a striking badge of fraud that Scott endeavors to further by advancing spurious arguments on appeal. *Walton*, 909 F.2d at 927 (agreeing with the district court that the taxpayer's "most incredible, . . . most nonsensical, child-like story," despite his college education and business experience, supported a fraud finding).

Finally, the Coles argue "that the Tax Court may have used acts by Darren Cole and Lisa Cole" and an investment

company "to cross contaminate Scott and Jennifer Cole, JAC, or Bentley Group and to conclude fraud." The Coles do not show where the Tax Court confused anything. Putting aside that the Coles raise this issue as a mere possibility, the Tax Court explicitly delineated between Scott and Jennifer's acts and Darren and Lisa's acts suggesting fraud. The Coles' claim that some of the acts suggesting fraud were on account of the Bentley Group or JAC ignores that Scott was a Bentley Group partner and Scott managed JAC's affairs.

Thus, the Coles fail to show where the Tax Court committed clear error in finding that the Commissioner proved "by clear and convincing evidence that Scott and Jennifer each fraudulently understated their tax liabilities for 2001."[5]

---

[5] Because we affirm the Tax Court's finding that the Coles fraudulently avoided tax liability, the Coles' statute-of-limitations defense fails. I.R.C. § 6501(c)(1) creates an exception for cases of a "fraudulent return with the intent to evade tax." In such cases, the tax "may be assessed . . . at any time." *Id.* And even without fraud, the three-year limitations period is extended to six years, where, as here, a taxpayer omits from gross income an amount greater than 25% of the gross income reported on the return. I.R.C.§ 6501(e)(1)(A); *see Beard v. Comm'r*, No. 09-3741, 2011 WL 222249, at *1 (7th Cir. Jan. 26, 2011). The IRS issued the Coles' notice of deficiency on April 11, 2008, within six years of April 11, 2002, when the Coles filed their 2001 return.

## Conclusion

We AFFIRM the judgment of the Tax Court.