**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CSX CORPORATION,
Plaintiff-Appellee,

v.                                                                    No. 96-2175

UNITED STATES OF AMERICA,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-95-1004)

Argued: July 10, 1997

Decided: September 11, 1997

Before NIEMEYER, MICHAEL, and MOTZ,
Circuit Judges.

_____

Reversed by published opinion. Judge Motz wrote the opinion, in
which Judge Niemeyer and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Steven Wesley Parks, Tax Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.
James Linwood Sanderlin, MCGUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:**
Loretta C. Argrett, Assistant Attorney General, Richard Farber, Helen
F. Fahey, United States Attorney, Tax Division, UNITED STATES

DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.
Courtney G. Hyers, CSX CORPORATION, Richmond, Virginia;
James D. Bridgeman, MCGUIRE, WOODS, BATTLE & BOOTHE,
L.L.P., Washington, D.C., for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case involves the now repealed "book income" provisions of
the alternative minimum tax applicable to corporate taxpayers. Proper
calculation of a corporation's "book income" is a somewhat esoteric
endeavor, but was critically important to corporations that had high
"book incomes" and low taxable incomes, as the millions of dollars
in tax refunds at issue in this case demonstrate.

I.

As part of the Tax Reform Act of 1986, Congress enacted the "al-
ternative minimum tax." See 26 U.S.C.A.§§ 55-59 (West 1988)
(amended 1988, 1989, 1990, 1992, 1993 and 1996). The alternative
minimum tax replaced the corporate minimum tax, which had been
passed in 1969 in response to the public perception that through
deductions and tax-planning many corporations were paying no taxes
at all. See Sandra G. Soneff Redmond, Comment, The Book Income
Adjustment in the 1986 Tax Reform Act Corporate Minimum Tax:
Has Congress Added Needless Complexity in the Name of Fairness,
40 Sw. L.J. 1219, 1221-22 (1987).

Congress concluded that the corporate minimum tax did not ade-
quately address this problem and so enacted the alternative minimum
tax as a more effective means of collecting taxes from taxpayers with
significant financial profits who were escaping tax liability through
tax preferences, deductions, or incentives. See  S. Rep. No. 99-313, at
518-19 (1986); Staff of the Joint Comm. on Taxation, Explanation of
the Tax Reform Act of 1986 434 (1987); Ahron H. Haspel & Mark
Wertlieb, New Law Makes Sweeping Changes to Corporate Minimum
Tax, 66 J. Tax'n 22, 22-23 (1987).

2

The concept behind this alternative minimum tax as applicable to corporate taxpayers was relatively simple. Corporations calculated both their "regular tax for the taxable year," and a second, alternative tax amount based upon a broader based definition of income, and increased by their financial, or book income. 26 U.S.C.A. §§ 55-56 (West 1988). In addition to its "regular tax" burden, a corporation would pay the amount the second, financial-based tax exceeded its "regular tax." By creating a second, alternative income measure that did not include many tax preferences and took into account the profits shown in a corporation's financial records, Congress hoped to remedy the situation in which "major companies have paid no taxes in years when they have reported substantial earnings." S. Rep. No. 99-313, at 519.

The actual mechanics of this alternative minimum tax were, of course, significantly more complex than the general concept. First, a corporation would assess its "tentative minimum tax" for the year. 26 U.S.C.A. § 55(a)(1) (1988). The "tentative minimum tax" was figured on the basis of the corporation's "alternative minimum taxable income," a much broader based calculation of income than the calculation used for "regular" tax purposes. In addition to the broader base for income calculation, the alternative minimum tax structure included the book income provisions to guarantee that a corporation with significant profits would not go untaxed. If a corporation's "adjusted net book income" -- the "net income or loss" of the corporation "set forth" in the corporation's "applicable financial statement" -- exceeded the corporation's "alternative minimum taxable income," the amount of the minimum taxable income would be increased by fifty percent of the "adjusted net book income." 26 U.S.C.A. § 56(f)(1), (2) (West 1988) (repealed 1990). In short, if a corporate taxpayer showed profits that outstripped its "alternative minimum taxable income," 50% of the profits above the originally calculated income were added to the "alternative minimum taxable income." This provision ensured that when a corporation showed a significant "financial" profit, that amount would be reflected in the "alternative minimum taxable income," and a corporation would be taxed on a portion of its financial profit even if it had little or no "regular tax" burden.

Once the "alternative minimum taxable income" was determined, a corporation figured its "alternative minimum tax" by subtracting

3

two items -- (1) "the exemption amount," which was $40,000 for corporations, and (2) a foreign tax credit, see 26 U.S.C.A. § 55(b)(1); twenty percent of the remaining amount was the "tentative minimum tax." 26 U.S.C.A. § 55(b)(1), (d)(2) (West 1988). The corporation then subtracted its "regular tax" liability for the year from its "tentative minimum tax." The amount by which the "tentative minimum tax" exceeded the corporation's "regular tax" liability was the amount of the "alternative minimum tax," i.e., the amount of extra tax that the corporation would have to pay. Thus, the alternative minimum tax utilized two methods to ensure that corporations with significant profits but low "regular taxes" would pay taxes: it used a broader based "alternative minimum taxable income" and it added to that income a portion of the corporation's "book income," or the profits shown on the company's financial statements.

At issue in this case are the adjustments available to corporate taxpayers in figuring their "book income" for the purposes of the alternative minimum tax in effect for tax years 1987 through 1989. See 26 U.S.C.A. § 56(f) (repealed 1990).* Congress granted the Secretary of Treasury "authority to adjust" the definition of book income "to prevent the omission or duplication of any item." 26 U.S.C.A. § 56(f)(2)(I).

The Secretary chose not to permit corporate taxpayers to allow adjustments to book incomes for "timing differences." See Treas. Reg. § 1.56-1(d) (1990); Temp. Treas. Reg. § 1.56-1T(d) (1987). Timing differences occur when a corporation takes a deduction (or loss) from its taxable income in a different year than it counts the same deduction (or loss) against its income for financial accounting purposes. Prior to 1987 "timing differences" had little effect on corporate taxes, because there was no tax effect to taking a tax deduction in a different year than the deduction was counted for financial accounting purposes. Between 1987 and 1990, however, a timing difference could have a significant effect because the alternative minimum tax was based on a corporation's book income as shown on its financial state-

_____

*The "book income" adjustment applied to tax years 1987 through 1989. For tax years after 1989, Congress retained the alternative minimum tax, but provided for its calculation by other methods.

4

ments, and so any difference in timing between tax and financial accounting could result in millions of dollars in additional taxes.

CSX Corporation seeks to deduct three separate amounts, all resulting from timing differences, from its 1987 book income to lower its liability under the alternative minimum tax. The first, and largest, amount arises from CSX's 1985 corporate restructuring plan. Under the plan CSX was required by general accounting principles to take a one time charge of $954 million against its 1985 financial earnings to cover the projected costs of the restructuring. CSX could not deduct the special charge on its 1985 corporate income tax return because federal tax law requires that the costs be deducted as they occur. In 1987 CSX actually incurred $109,916,780 in losses under its restructuring plan, and deducted that amount from its taxable income in that year. CSX did not deduct the $109 million from its financial or book income in 1987, however, because it had already deducted that amount for accounting purposes in 1985 as part of the 1985 $954 million charge. Thus, there was a timing difference, and CSX's 1987 book income was $109 million higher than its taxable income. As a result CSX faced a significant tax burden -- approximately $3,903,000 -- under the alternative minimum tax based upon its book income.

The second timing difference occurred as a result of accounting errors by CSX Realty, a subsidiary of CSX. After CSX's 1987 financial statements had been issued, and before the filing of CSX's 1987 tax returns, CSX discovered that CSX Realty had erroneously overstated its 1987 earnings by $13,437,764. Thus, CSX's reported 1987 financial earnings were inflated by this amount. For financial accounting purposes CSX recognized this error in 1988, but sought to apply the error to its book income in 1987 for purposes of the alternative minimum tax. Again, a timing difference occurred: CSX incurred a loss in 1987 that it did not report for financial accounting purposes until 1988, but nonetheless sought to apply the loss to its 1987 book income for purposes of calculating the alternative minimum tax. When it was not permitted to do this, it incurred an additional tax liability of approximately $477,000.

The third timing difference resulted from an accounting change at Nashville and Decatur Railroad. This one-time adjustment resulted in

5

an addition of $11,331,015 to CSX's 1987 book income based upon income actually earned in the years 1983-87. Thus, a timing difference occurred because Nashville and Decatur had earned, and paid taxes on, the $11 million in 1983-87, but that same amount was added to its 1987 financials, increasing CSX's 1987 tax burden under the alternative minimum tax by $402,000.

CSX paid its 1987 taxes without regard to the three timing differences. The company later filed a claim for a refund, asserting that the three timing differences should have been taken into account in computing its book income, and consequently its alternative minimum tax. CSX claimed its 1987 tax burden was overstated because of the above three items, in the total amount of $4,783,029. CSX argued that including these amounts in its book income for purposes of the alternative minimum tax overstated its earnings and resulted in an unfair tax burden.

After the Internal Revenue Service rejected CSX's claim for refund, the company filed this refund suit. On cross-motions for summary judgment, based on the undisputed facts set forth above, the district court granted summary judgment to CSX. See CSX Corp. v. United States, 929 F.Supp. 223, 224 (E.D. Va. 1996). The court invalidated Treasury Regulation § 1.56-1(d), which forbids adjustments to book income based on timing differences. The court reasoned that this regulation conflicted with the "clear language" of the governing statute, 26 U.S.C.A. § 56(f)(2)(I), which requires the Secretary of the Treasury to adjust book income "`to prevent the omission . . . of any item.'" Id. (quoting 26 U.S.C.A. § 56(f)(2)(I)). The district court believed that timing differences came within the plain meaning of "omission" in the statute. Id. at 225-26. Accordingly, the court granted CSX the refund it requested. Id. at 226. The United States appeals, and we now reverse.

II.

The single question before us is whether Treasury Regulation § 1.56-1(d)(4) constitutes a valid interpretation of 26 U.S.C.A. § 56(f)(2)(I). The validity of the regulation is a question of law, which we review de novo. See United States v. Boynton, 63 F.3d 337, 342 (4th Cir. 1995).

6

Section 56(f)(2)(I) provides:

> Secretarial Authority to Adjust Items. -- Under regulations, adjusted net book income shall be properly adjusted to prevent the omission or duplication of any item.

26 U.S.C.A. § 56(f)(2)(I).

The regulation promulgated pursuant to § 56(f)(2)(I) did not allow corporations to adjust their book incomes to reflect timing differences. The preamble to the final regulation states the Secretary's position on timing differences:

> Numerous commentators stated that the proposed regulations inappropriately prohibit an adjustment for timing differences. A timing difference exists when an item of income or deduction is recognized in different periods for purposes of pre-adjustment alternative minimum taxable income and financial statement income. Timing differences arise because tax accounting and financial accounting principles treat certain items as accruing in different periods.

. . .

> The final regulations provide no adjustment for timing differences. The specific grant of authority to the Secretary under section [56(f)(2)(I)] to make adjustments to prevent the omission or duplication of any item was intended to prevent the omission of any item from adjusted net book income and the duplication of any item in adjusted net book income. Because income resulting from a timing difference is reported in adjusted net book income only once, there is no duplication of adjusted net book income to be adjusted under section [56(f)(2)(I)].

55 Fed. Reg. 33,673 (1990) (emphasis added).

Example 1 of Temp. Treas. Reg. § 1.56-1T(d)(4)(v), also illustrates the Secretary's interpretation of § 56(f)(2)(I):

7

Example (1). Corporation A uses a calendar year for both financial accounting and tax purposes. In 1986, A's financial statement included a $100 financial accounting loss for a plant shutdown. A could not deduct the loss on its 1986 Federal income tax return. In 1987, A deducts the loss from the 1986 plant shutdown in its 1987 Federal income tax return. As a result, A's 1987 adjusted net book income exceeds its 1987 pre-adjustment alternative minimum taxable income by $100 (an amount equal to the deduction for the 1986 plant shutdown). Pursuant to paragraph (d)(4)(I) of this section, A cannot make an adjustment to net book income.

Temp. Treas. Reg. § 1.56-1T(d)(4)(v) (1987).

The Secretary asserts that the words "omission" or "duplication" in § 56(f)(2)(I) do not in any way require inclusion of timing differences but rather are directed only to the elimination of miscalculations of book income, for example, to prevent a corporation from excluding or double counting an item in a way contrary to general accounting principles. In contrast, CSX argues that Treasury Regulation 1.56-1(d) is an impermissible interpretation of § 56(f)(2)(I) because it conflicts with the plain meaning of the statute, i.e. Congress directed that the regulations "shall" prevent "the omission" of "any item," and "any item" must include timing differences.

The fundamental problem with CSX's argument is that it seeks to apply a deduction from taxable income to book income. Nothing in the statute or its legislative history supports this interpretation. In fact, the whole idea of an alternative minimum tax is that corporations with many deductions from taxable income will pay taxes partially based upon the "net income or loss of the taxpayer set forth on the taxpayer's applicable financial statement," or the taxpayer's "adjusted net book income." 26 U.S.C.A. § 56(f)(2)(A) (West 1988). Thus, the statute provides for an alternative minimum tax based on a corporation's "financial statement." Id. In the case of a timing difference the corporation's financial statement does not reflect a tax deduction, because that deduction is included for financial accounting purposes in a different year. As such, there is no "omission" in the case of a timing dif-

8

ference, rather the deduction to taxable income is simply reflected in a different year for financial accounting purposes.

Notwithstanding CSX's claims, the plain language of the statute supports this conclusion. Section 56(f)(2)(I) directs establishment of regulations "to prevent the omission . . . of any item." The dictionary defines "omission" as "apathy toward or neglect of duty: lack of action." Webster's Third New Int'l Dictionary 1574 (1993); see also Black's Law Dictionary 1086 (6th ed. 1990) ("The neglect to perform what the law requires."). The statute thus directs that regulations ensure that corporations do not "neglect" items in calculating book income. It does not, as CSX argues, require that the regulations provide for the addition or subtraction of various tax deductions from "adjusted net book income," or change the definition of how to calculate "adjusted net book income."

Moreover, § 56(f)(2)(A) defines "adjusted net book income" as "the net income or loss of the taxpayer set forth on the taxpayer's applicable financial statement, adjusted as provided in this paragraph." 26 U.S.C.A. § 56(f)(2)(A) (emphasis added). Thus, the statute itself establishes that any alterations to "adjusted net book income" are to be determined by "this paragraph." Nothing in "this paragraph" or anywhere else in § 56(f) requires alteration of "adjusted net book income" to include timing differences. Certainly, § 56(f)(2)(I) does not suggest, let alone mandate, that "adjusted net book income" be "adjusted" to include timing differences; the word "omission" does not shrink or enlarge the statutory definition of "adjusted net book income." Instead, it requires regulations to ensure that book income is calculated according to the statutory definition, without any omissions or duplications.

Thus, the plain language of the statute does not lend support to the claim that a timing difference is an "omission or duplication of any item" that rightfully should be included in "adjusted net book income." 26 U.S.C.A. § 56(f)(2)(I). Rather, the statute's language simply states Congress's direction that regulations be established to prevent corporations from miscalculating "adjusted net book income" to omit or duplicate any item that would be included under the statutory definition of book income.

9

The legislative history of § 56(f)(2)(I) also supports the Secretary's interpretation. The Senate Report states that regulations under § 56(f)(2)(I) will be used "to prevent the recording of items directly to the financial statement asset, liability, or equity accounts that are properly included as items of financial statement income or expense." S. Rep. No. 99-313, at 534. Congress thus voiced its concern that corporations would hide book income in "asset, liability, or equity accounts," and designed § 56(f)(2)(I) to ensure that these items not be omitted from book income. Congress similarly foresaw that regulations promulgated under § 56(f)(2)(I) would "require adjustments be made to book income where the principles of this provision . . . would be avoided through the disclosure of financial information through the footnotes and other supplementary statements." H.R. Conf. Rep. No. 99-841, at II-274 (1986), reprinted in 1986 U.S.C.C.A.N. 4075, 4362. Again, through § 56(f)(2)(I) Congress sought to prevent corporations from "omitting" income by use of footnotes in their financial statements.

Furthermore, the Secretary's interpretation is consistent with Congress' stated purpose for enacting the alternative minimum tax. The Senate Finance Committee explained that an alternative minimum tax based on financial accounting concepts was necessary to "address concerns of both real and apparent fairness . . . that whenever a company publicly reports substantial earnings . . . that company will pay some tax." S. Rep. No. 99-313, at 520; see also id. at 518 (The "overriding objective" of the alternative minimum tax was "to ensure that no taxpayer with substantial economic income can avoid significant tax liability by using exclusions, deductions and credits."). Congress was concerned with the "perception" of unfairness that arose in "instances in which major companies have paid no taxes in years when they reported substantial earnings, and may even have paid substantial dividends to shareholders." Id. at 519. Hence, the alternative minimum tax was designed to eliminate situations where corporations show substantial financial or book income, and yet pay little or no taxes because their taxable income is lowered by tax credits or deductions. Allowing corporations to include timing differences in calculating their adjusted net book income could create the exact problem Congress sought to remedy: corporations reporting significant profits in their financial statements could pay little or no taxes based on losses reported in an earlier or later years' financial statements.

10

Finally, even if the plain language and legislative history of § 56(f) did not require the Secretary's interpretation, they certainly did not prohibit it. There can be little question that the Secretary's interpretation of the statute is at least permissible, and that alone is sufficient to uphold Treas. Reg. § 1.56-1(d)(4). See Commissioner v. Portland Cement Co., 450 U.S. 156, 169 (1981) ("Treasury Regulations `must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'") (quoting Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948)).

III.

In addition to its statutory argument, CSX presses several other contentions. They are equally unpersuasive.

The company maintains that "omission . . . of any item" must include timing differences, because any other result overstates its "book income" and thus its tax burden. What CSX fails to understand, however, is that its book income for 1987 is not overstated without the timing differences. In fact, to allow CSX to subtract the timing differences from its 1987 book income would result in an impermissible "duplication," because each of these items were included in CSX's financial earnings statements for another year. See 26 U.S.C.A. § 56(f)(2)(I). Thus, the items would literally be duplicated, because they would be included in CSX's financial earning statements for one year, and then again in CSX's financials in 1987 in order to calculate "adjusted net book income" for that year. Far from requiring CSX's interpretation, § 56(f)(2)(I), by authorizing the Secretary to formulate regulations to prevent "duplication," actually compels precisely the interpretation formulated by the Secretary in the challenged regulation.

CSX also contends that the Secretary's position is inconsistent with Example (5) of Treasury Regulation § 1.56-1(d)(4)(viii), which illustrates that a corporation owning 10 percent (or more) of the stock of a foreign corporation must include in its book income the amount of the "Subpart F" income realized by the foreign corporation. See 26 U.S.C.A. § 951 (West Supp. 1997) (defining "Subpart F" income). Because "Subpart F" income is not typically included under accounting principles in a corporation's financial statement until a dividend

11

is received, CSX argues that this example establishes that "book income" is not limited to a corporation's financial statement, and timing differences and other adjustments should be allowed to better reflect true corporate earnings. The difficulty with this argument is that Example (5) of Treasury Regulation § 1.56-1(d)(4)(viii) is explicitly required by the statute itself. <u>See</u> 26 U.S.C.A. § 56(f)(2)(C)(ii) (West 1988); S. Rep. No. 99-313, at 532; Staff of the Joint Comm. on Taxation, <u>General Explanation of the Tax Reform Act of 1986</u> 453 (1987). As noted above, there is no statutory requirement, or even support, for adjusting for the timing differences at issue here, and therefore Example (5) is readily distinguishable.

Finally, CSX relies on the extensive negative public comments generated in response to Treasury Regulation § 1.56-1(d). These comments only demonstrate that the regulation was unpopular, not impermissible. It is true that Congress' decision to pass the alternative minimum tax stripped CSX of a tax benefit, but that does not change the definition of "omission" or of "adjusted net book income."

IV.

For all of these reasons, the judgment of the district court is

<u>REVERSED</u>.

12