In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3478

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 5426-05—**Joseph Robert Goeke**, *Judge.*

ARGUED MAY 23, 2012—DECIDED AUGUST 31, 2012

Before MANION, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal presents two distinct questions regarding the taxation of insurance companies. Petitioner State Farm Mutual Automobile Insurance Company has appealed from two rulings of the United States Tax Court that were part of the same case. One ruling concerns the tax treatment of bad-faith punitive damage awards that have not yet been paid.

The other concerns the alternative minimum tax regime — a complicated area of the tax code that high-earning individuals and corporations must contend with, made even more complicated here by the special rules applicable to life insurance companies, especially when they are part of larger insurance enterprises.

During the tax years relevant to this appeal, petitioner State Farm was the tax filer for both the life insurance and non-life (automobile, etc.) insurance subgroups that make up State Farm. Petitioner filed consolidated tax returns that covered both insurance subgroups, as permitted by the tax code. In late 2004, respondent Commissioner of Internal Revenue determined deficiencies in those returns for the tax years 1996 to 1999. State Farm responded with a petition that raised seven issues, one of which included a revised method for calculating its alternative minimum tax liability. The revised AMT calculations, State Farm argued, meant that rather than owing about $75 million in additional taxes, it would instead be entitled to some $500 million in additional refunds. Five of the seven issues raised by State Farm were settled, leaving only the AMT issue and one other — which we call the loss reserve issue — for the Tax Court to resolve. Both of those issues involve events in tax years 2001 and 2002, which relate to State Farm's 1996 to 1999 tax returns via various carry-back rules for crediting tax losses.

In 2010, the Tax Court ruled that State Farm should not have included an adverse $202 million award of compensatory and punitive damages for bad faith in

its insurance loss reserve for its federal income tax returns for 2001 and 2002. 135 T.C. 543 (2010). We affirm the Tax Court's decision regarding the punitive damages portion of the award, though for reasons different from the Tax Court's. Pending clearer guidance about the recommended tax treatment of punitive damage awards from the National Association of Insurance Commissioners (to whom Congress has commanded deference in this regard), we hold that punitive damages should be treated as regular business losses that are deductible when actually paid rather than deducted earlier as part of insurance loss reserves. With regard to the compensatory damages portion of the award, however, we agree with amici insurance associations and reverse the Tax Court. Extra-contractual obligations like the compensatory damages for bad faith have long been included in insurance loss reserves, and clear guidance from the NAIC, which the federal tax statutes essentially incorporate for key details of taxing insurance companies, supports that result.

In a prior phase of the same case, the Tax Court rejected the method by which State Farm wanted to recalculate its alternative minimum tax liability for tax years 2001 and 2002. 130 T.C. 263 (2008). State Farm's newly proposed method for computing this liability used one number for Pre-adjustment Alternative Minimum Taxable Income in one calculation, and another number for Pre-adjustment Alternative Minimum Taxable Income in another calculation. State Farm effectively applied a statutory "loss limitation" rule in one place but not in the other. The result of this new math would be

the creation from thin air of a virtual tax loss some $4 billion larger than State Farm's actual loss (which was itself a whopping $5.3 billion) in the 2001 tax year — and consequently more than $500 million in new retroactive tax credits. We affirm the Tax Court's rejection of State Farm's unreasonable new interpretation of the tax code. We find nothing in the text or purpose of the alternative minimum tax statutes and regulations to support math that uses two different values for the same variable in adjacent calculations.

We review the Tax Court's findings of fact for clear error and its conclusions of law *de novo*. *Freda v. Comm'r of Internal Revenue*, 656 F.3d 570, 573 (7th Cir. 2011). Both the loss reserve and the alternative minimum tax issues here presented legal questions for the Tax Court to decide based on facts that were stipulated by the parties. Consequently, our review is plenary. Because the two challenged rulings of the Tax Court are entirely separable, and in fact were resolved in separate opinions more than two years apart, we treat them separately below.

## I.  *The Loss Reserve Issue*

Insurance companies maintain loss reserves in their annual statements and are allowed to take tax deductions for reasonably estimated insurance losses even before those losses are actually paid out to claimants. See 26 U.S.C. § 832(b)(5). This special tax treatment, which also requires discounting estimated future losses to present value, helps to relate income from insurance premiums in a given tax year to the expected claim ex-

penses (losses) on those same insurance contracts, which may not actually be paid until years later. The rule avoids time-value distortions that would arise if companies had to pay taxes immediately on profits from premiums but were allowed only years later to deduct claim expenses that reduced those profits. The rule is unique to the insurance industry, and the losses that can be so deducted are defined by statute and regulation.

Under section 832(b)(5), deductible "losses incurred" must be "on insurance contracts" and can include "unpaid losses on life insurance contracts plus all unpaid losses (as defined in section 846)." *Id.* Deductible losses incurred do not include ordinary business expenses, which can be deducted only when actually paid. See 26 U.S.C. § 461(h) (requiring ordinary deductions to be taken in the tax year in which "economic performance" occurs). Deductible losses incurred must "represent a fair and reasonable estimate of the amount the company will be required to pay," and deductions can be disallowed if deemed unreasonable. 26 C.F.R. § 1.832-4(b). This statutory definition of "losses incurred," like many statutory definitions, requires interpretation — here to determine whether compensatory and/or punitive damages arising from bad faith claims are properly included in deductible loss reserves before they are actually paid. Because of the way Congress drafted section 832, our ordinary interpretive tools are supplemented by guidance from the National Association of Insurance Commissioners, which plays an unusual if not unique role in filling in the details of federal tax law.

Section 832 requires that an insurance company's "gross income" — which includes "premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred" — be "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners." 26 U.S.C. § 832(b); *Sears, Roebuck & Co. v. Comm'r of Internal Revenue*, 972 F.2d 858, 866 (7th Cir. 1992). The NAIC is an organization of state insurance regulators that develops and promulgates accounting standards for insurance companies. States require insurance companies domiciled within their borders to file annual statements. Many states, including Illinois (State Farm's domicile here), require those annual statements to conform to NAIC's accounting instructions. By enacting section 832 with its reference to the NAIC-approved statement, Congress has similarly compelled use of the NAIC instructions for federal tax purposes. *Sears, Roebuck*, 972 F.2d at 866 ("State insurance commissioners' preferences about reserves thus are not some intrusion on federal tax policy; using their annual statement is federal tax law."). As in *Sears, Roebuck*, we consider the NAIC's promulgated views when determining whether punitive damages and extra-contractual liabilities should be included in loss reserves that correspond to deductions under section 832.

In 2001 and 2002, State Farm included a $202 million adverse judgment in its loss reserve and claimed a tax deduction for it as a discounted unpaid loss under section 832(b)(5). The judgment was part of the long-running

Campbell litigation in Utah, which began with a fatal auto accident in 1981 and eventually led to a "bad-faith" jury verdict in 1996 — one related to State Farm's handling of the claim. The award was reduced by the trial court in 1998 and then reinstated by the Utah Supreme Court in 2001. As reinstated, the award included $1 million in compensatory damages, $145 million in punitive damages, $55.2 million in interest, and $800,000 in fees, totaling $202 million. State Farm appealed to the United States Supreme Court, but in the meantime, it included the $202 million in its loss reserve and took corresponding tax deductions for this still-unpaid judgment.

In 2003, though, the Supreme Court reversed the punitive damages portion of the award and remanded for reconsideration of the amount. See *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). State Farm then reduced its loss reserve for the 2003 tax year and paid taxes on the resulting increase in net income. After reconsideration in Utah courts, State Farm's final liability from the Campbell bad-faith verdict was about $17 million.[1]

---

[1] Because of interest, varying discount rates, and the time value of money, State Farm's removal of the Campbell judgment from its reserve (and resulting higher taxes) in 2003 did not perfectly balance its prior inclusion of the judgment in that reserve (and resulting deductions carried back to prior years). We will spare the reader the actual calculations, but the issue is not moot because, State Farm asserts, a decision

(continued...)

The Campbell award included compensatory damages and punitive damages, both stemming from bad faith in handling a claim rather than from an insured risk covered by the underlying insurance contract, such as the auto accident itself. A bad-faith lawsuit asserts that the insurance company breached one of the implied terms or special duties that the law recognizes as arising from insurance contracts. Amici insurance associations inform us that the insurance industry refers to compensatory liabilities that arise from these implied terms as "extra-contractual obligations." Without explanation, the Tax Court treated compensatory and punitive damages together and then held that the analysis of *Sears, Roebuck* did not apply to these extra-contractual losses. We believe this was a twofold error. As discussed below, our *Sears, Roebuck* holding was broad and its rationale applies here. Also, because of differences in the NAIC's guidance regarding punitive damages and compensatory damages in bad-faith cases, they should not be treated the same under *Sears, Roebuck*. Compensatory damages for bad faith are clearly within the NAIC guidance concerning what should be included in loss reserves, but so far that guidance has not been extended to punitive damage awards. We address them separately.

---

[1] (...continued)
on the loss reserve issue will have a net effect on the order of $7 million to $8 million.

A. *Compensatory Damages for Bad Faith*

Based on information provided by the parties and amici here, "extra-contractual obligations" seems to be a broad category as used by the insurance industry — one that may include a number of different kinds of liability, such as losses above policy limits, fees and costs, interest or consequential damages from delayed payment of claims, and mental distress damages for improper claim handling. We use the phrase here to denote only the $1 million in bad-faith compensatory damages, and interest thereon, included in the Campbell judgment. We need not and do not attempt to define the full scope of the extra-contractual obligations category or decide on the proper tax treatment of other kinds of liability potentially included in it. The question we address here is whether the compensatory damages portion of the Campbell bad-faith judgment is a deductible loss incurred on an insurance contract that could be deducted before it was paid. We conclude that it is, and we reverse the contrary decision of the Tax Court.

The statutory language we interpret here is part of a series of nested definitions that require the reader to follow a long trail similar to a scavenger hunt, aided by added italics. Section 832(a) states that the insurer's "taxable income" equals "the *gross income* as defined in subsection (b)(1) less the deductions allowed by subsection (c)." 26 U.S.C. § 832(a). "Gross income" is defined in turn as:

> the combined gross amount earned during the taxable year, from investment income and from *underwriting*

*income* as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners.

§ 832(b)(1). This is the first reference to use of the NAIC annual statement. "Underwriting income" in turn includes "the premiums earned on insurance contracts during the taxable year less *losses incurred* and expenses incurred." § 832(b)(3). "Losses incurred" are defined as

losses incurred during the taxable year *on insurance contracts* computed as follows:

(i) To losses paid during the taxable year, deduct salvage and reinsurance recovered during the taxable year.

(ii) To the result so obtained, add all unpaid losses on life insurance contracts plus *all discounted unpaid losses (as defined in section 846)* outstanding at the end of the taxable year and deduct all unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year. . . .

§ 832(b)(5). Finally, section 846 defines "discounted unpaid losses," with exceptions not relevant here, as "the unpaid losses shown in the annual statement filed by the taxpayer." 26 U.S.C. § 846(b)(1).[2]

---

[2] It makes no difference for our purposes whether an unpaid loss is treated as a subtraction from gross income under

(continued...)

Both section 832(b)(1) and section 846 (which became effective after the events underlying our decision in *Sears, Roebuck*) refer to the NAIC-approved annual statement as the source of the unpaid losses used in calculating gross income. Underwriting income, which includes losses incurred, must be computed based on the annual statement. Any doubt about whether the unpaid losses (included in those losses incurred) are also to be computed according to the annual statement is resolved by the specific reference to that statement in section 846. We agree with State Farm that the NAIC-approved annual statement provides the rule for computing deductible loss reserves under section 832, at least where the NAIC has in fact provided a rule.

The other key interpretive point is that whatever unpaid losses are, they must be "on insurance contracts." The parties disagree about whether the word "on" refers only to claim losses on insured risks, or means something like "related to" insurance contracts — and therefore also includes losses on State Farm's handling of claims. At least with regard to compensatory damages in bad-faith lawsuits, the NAIC's guidance resolves this otherwise tricky dispute.

---

[2] (...continued)
§ 832(b)(1) or as a deduction under § 832(c)(4). The code is clear that taxpayers may choose either treatment so long as they do not double-count a loss as both a subtraction and a deduction. The deduction paragraph refers to the same definition for losses incurred. See 26 U.S.C. § 832(c)(4) (referring to § 832(b)(5)).

The Commissioner argues that the Campbell judg-
ment was not a loss *on* an insurance contract because it
did not relate to an insured risk covered by the contract,
but was, as the Tax Court held, a liability incurred
because of State Farm's own misconduct in handling
the Campbell claim. Because the loss did not arise out of
a contemplated risk but instead from torts committed
by State Farm, the Commissioner argues, it is not suf-
ficiently tied to the insurance contract to fall under
the definition in section 832(b)(5). The Commissioner
focuses on the punitive damages portion of the award,
noting that such damages are intended to punish fraud,
not to compensate for breach of contract.

State Farm argues that the bad-faith tort liability ex-
pressed in the Campbell judgment arose directly from
implied terms in the insurance contract. In many states
such contracts are interpreted to include duties of
good faith and fair dealing by insurers, and so any re-
sulting bad-faith tort judgments are necessarily tied to
the existence of an insurance contract. Depending on
state law, an insured might have tort claims that
require a showing of breach of an express or implied
contract term, or might have claims for both contractual
breach of implied terms and tortious breach of implied
duties arising from the same facts. See, *e.g.*, *Logan v.
Commercial Union Ins. Co.*, 96 F.3d 971, 979-80 (7th Cir.
1996) (discussing Indiana law); see also *Beck v. Farmers
Ins. Exchange*, 701 P.2d 795, 799-800 (Utah 1985) (discussing
the relation between contract and tort theories of liability
under Utah law, and distinguishing between third-
party and first-party insurance); *Campbell v. State Farm*

*Mut. Auto. Ins. Co.*, 840 P.2d 130, 139 (Utah App. 1992) (early decision in Campbell litigation saga). State Farm points out that without an insurance contract from which to imply terms and duties, there could be no bad-faith Campbell judgment.[3]

Without guidance from the NAIC, this would be a close question. Both sides advance some credible arguments, and the statutory language itself is not helpful with the meaning of the phrase "on insurance contracts" as applied to this question. We might just as easily read the phrase broadly to mean "related to" or "arising from" insurance contracts as read it more narrowly to mean "concerning contractually allocated risks." But the NAIC has already provided clear guidance that supports State Farm's position: compensatory damages for "bad faith" should be included in unpaid loss reserves in annual statements — and consequently qualify as deductible losses per section 832.

---

[3] The Commissioner attempts to draw a line between bad-faith actions that arise from contracts and those that sound in tort, but this distinction would have the unhappy effect of making the interpretation of the "on insurance contracts" language in a federal statute depend (and vary) based on subtle differences in states' common law of bad-faith claims. Insurance companies would have to conduct a fifty-state survey to determine whether the state where each lawsuit arose called the suit a contract case (based on an implied good-faith term), or a tort case (based on an implied duty of good faith), or both. But this is a distinction without a real difference relevant to the question whether an unpaid loss should be deductible or not.

The NAIC publishes an Accounting Practices and Procedures Manual that includes a number of Statements of Statutory Accounting Principles, which are promulgated by action of the entire membership. SSAP Number 55 applies to "Unpaid Claims, Losses, and Loss Adjustment Expenses" that are included in loss reserves in the approved annual statement. Unfortunately, SSAP Number 55 is not significantly clearer than the statutory "on insurance contracts" language on this issue — it uses the language "losses relating to insured events." But in 2004, the NAIC issued an authoritative "interpretation" (INT 03-17) clarifying this precise question. The interpretation states: "Insurers are sometimes parties to lawsuits known as extra contractual obligations lawsuits; these include 'bad faith' lawsuits." Such lawsuits "arise out of the handling" of claims. The NAIC interpretation concludes: "Claims related extra contractual obligations losses and bad faith losses shall be included in losses." We could not ask for a clearer statement of the NAIC's view regarding the inclusion of compensatory bad-faith damages in loss reserves. Although the INT 03-17 interpretation of SSAP Number 55 was released after State Farm's decision to include the Campbell judgment in its loss reserves, it provides persuasive evidence that State Farm's prior interpretation of NAIC guidance was correct with regard to the compensatory damages. (As explained below, however, SSAP Number 55 and INT 03-17 both state they do not apply to punitive damages.)

The Tax Court did not fully treat this NAIC guidance because it did not consider our analysis in *Sears, Roebuck*

controlling regarding the extra-contractual losses at issue here. The court reasoned that *Sears, Roebuck* concerned "estimated insured losses and this case is about extracontractual losses." Nothing about our analysis in *Sears, Roebuck* indicates that its reasoning was so limited. The point was that section 832(b)(5) defers to the NAIC accounting rules. *Sears, Roebuck* applies here. See 972 F.2d at 866 (rejecting arguments for treating subsection (b)(5) losses differently and noting that they are part of the subsection (b)(1) income calculation, which refers to the annual statement.) The Tax Court believed that the Campbell judgment was not "on" an insurance contract under section 832(b)(5), so it need not look at the NAIC guidance. This was the wrong approach. In the linked chain of definitions we described above, Congress referred to the NAIC annual statement above (section 832(b)(1)) and below (section 846) the allegedly exclusionary "on insurance contracts" language. Congress commanded use of the NAIC instructions to compute underwriting income, and then clarified in section 846 that what the NAIC says is an unpaid loss for annual statement purposes controls for tax purposes, as well. There is nothing unreasonable about the NAIC's interpretation that some extra-contractual losses are appropriately treated as unpaid losses on insurance contracts and included in section 832(b)(5) unpaid loss reserves.

Amici insurance associations offer a persuasive policy reason to support this result for compensatory damages. Underwriting income is a key factor that insurance companies and regulators use to assess capital

requirements. It is also used as an input for the complicated ratemaking and rate approval processes. By tying the computation of unpaid loss reserves for tax purposes to the annual statement used for these other purposes, Congress has allowed insurance companies to maintain just one set of books. We can see no reason to overturn the settled practice of the insurance industry in this area.[4]

For these reasons, we reverse the Tax Court's ruling with regard to the compensatory damages portion of the Campbell judgment. Compensatory damages in bad-faith lawsuits against insurers are included in unpaid loss reserves under authoritative NAIC annual statement guidance, and are thus properly included in deductible unpaid losses under section 832.

B. *Punitive Damages for Bad Faith*

Punitive damages are another matter. The NAIC guidance we relied upon above regarding compensatory damages does not apply to punitive damages. To begin

---

[4] Amici also inform us that under prior NAIC guidance, insurance companies included extra-contractual obligations in their loss reserves either as section 832(b)(5) losses or as section 832(b)(6) loss adjustment expenses. Both losses and loss adjustment expenses go into deductible loss reserves. Thus, the NAIC's 2004 interpretation was merely choosing one of two possible ways to categorize such obligations, not breaking new ground over their inclusion in deductible reserves.

with, the NAIC's Statement of Statutory Accounting Principles Number 55 states: "This statement does not address liabilities for punitive damages." Instead, punitive damages are to be recorded in annual statements in accordance with SSAP Number 5, but it addresses whether to report unpaid punitive damages judgments at all, not *where* to report these liabilities on annual statements — whether in insurance loss reserves or in ordinary operating reserves. The Commissioner argues that SSAP Number 5 liabilities are generally reported as ordinary operating losses. But as above, the SSAPs approved by the entire NAIC membership do not conclusively resolve the statutory interpretation question over punitive damages here. The relevant guidance is at best ambiguous.

The INT 03-17 interpretation that guided our decision on compensatory damages reaffirms that SSAP Number 55 does not apply to punitive damages and so is no help here. State Farm asserts that punitive damages, like the compensatory damages discussed above, fall within the "claims related extra contractual obligations losses and bad faith losses" language of interpretation INT 03-17. In response, the Commissioner argues that reading the interpretation this way would put the interpretation in conflict with the guidance it interprets. State Farm's reading would include punitive damages in loss reserves that are governed by guidance that disavows its own application to punitive damages. We agree with the Commissioner on this point.

To avoid this result, State Farm offered the testimony of Norris Clark, who chaired the working group that

drafted the INT 03-17 interpretation. He testified that the group *meant* for the "bad faith losses" language to include punitive damages. If that is true, significant time and expense could have been saved on this portion of this appeal simply by saying explicitly in INT 03-17 that unpaid punitive damages go in deductible loss reserves, even though SSAP Numbers 55 and 5 tend to suggest otherwise. Given the actual texts of SSAP Numbers 55 and 5 and INT 03-17, however, we cannot accept the word of a paid witness — even one who was involved in drafting the relevant interpretation — over the clear implication in the guidance adopted by the entire NAIC membership that punitive damages are to be treated differently. Congress has provided that underwriting income is to be "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners." 28 U.S.C. § 832(b)(1). We think that the "approved by" language requires something with much more weight than what a witness tells the court was "really" meant. While we held in *Sears, Roebuck*, and hold here, that this statutory language requires some deference to the guidance promulgated by the NAIC, that deference does not extend to an individual commissioner's opinion attempting to resolve ambiguity in the official guidance.[5]

---

[5] Nor is our deference under *Sears, Roebuck* absolute. Other circuits have rejected arguments that expense items are per se deductible just because they are included in the relevant

(continued...)

We also note but do not attach significant weight to the fact that various state regulators and outside auditors approved State Farm's 2001 and 2002 annual statements — statements that included the Campbell punitive damages award in the unpaid loss reserve. State Farm has provided no evidence that the entities in question addressed or engaged with the specific issue now presented. Even if they had, we are not bound by the section 832 statutory language to consider the views of any auditor or regulator other than the NAIC as a whole. For their part, amici insurance associations here were content to stress the distinction between punitive and ordinary extra-contractual obligations and argue that whatever the result for punitive damages, we should reverse the Tax Court on the compensatory damages, as we have.

Absent binding directives from the NAIC membership for insurance companies to treat unpaid punitive damages as deductible losses, the parties and amici

---

[5] (...continued)

portions of the NAIC annual statement. See, *Home Group, Inc. v. Comm'r of Internal Revenue*, 875 F.2d 377, 381 (2d Cir. 1989) ("An accounting practice for bookkeeping purposes is not necessarily what the Code allows for tax accounting purposes.") and *Western Casualty & Surety Co. v. Comm'r of Internal Revenue*, 571 F.2d 514, 517 (10th Cir. 1978). We need not opine whether bad-faith punitive damages would conflict with the "on in-surance contracts" statutory language in a future case if the NAIC clearly directs that they be included in insurance loss reserves on annual statements.

here have identified a number of compelling reasons not to do so. First, punitive damage awards are typically treated as rare, exceptional occurrences and are not included in insurance ratemaking and rate approval processes. Insurance loss reserves, however, are a critical input for ratemaking, and potentially for other regulatory formulas. Punitive damage awards that were included in those loss reserves for purposes of recording a tax deduction would then have to be backed out for ratemaking. This seems both inconvenient and indicative that punitive damages should instead be treated as operating losses when actually paid.

Second, allowing insurance companies to take a tax deduction for punitive damage awards before they are actually paid does not serve the purpose of the insurance-industry exception to the ordinary deduct-when-paid rule. That exception is meant to avoid distortions and "float" arising from the delay between receiving premium income and paying claim expenses. But large punitive damage awards can themselves be gross distortions on any company's balance sheet, and they are even farther removed from legitimate claim expenses than compensatory damages in bad-faith suits. Finally, as State Farm's own experience indicates, it can be difficult to estimate reasonably, as the taxpayer must per 26 C.F.R. § 1.832-4(b), "the amount the company will be required to pay." Punitive damage awards are frequently reduced or overturned post-verdict, as with the Campbell judgment and apparently at least one other large judgment against State Farm in recent years. See State Farm Br., n.7, noting reversal of a $1 billion

judgment (including punitive damages) in the Avery class action in Illinois, which State Farm had not reported as an unpaid deductible loss; see also *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) (ordering reduction in a punitive damage award that was 500 times the compensatory damages); Anthony J. Sebok, *Punitive Damages: From Myth to Theory*, 92 Iowa L. Rev. 957, 971-72 (2007) (noting rarity and high reduction rate on appeal of awards with high ratios of punitive to compensatory damages), and sources cited therein; Michael Rustad, *The Closing of Punitive Damages' Iron Cage*, 38 Loy. L.A. L. Rev. 1297, 1334-35 (2005) (noting high reversal rate and close appellate scrutiny of punitive damage awards); Catherine M. Sharkey, *Punitive Damages: Should Juries Decide?*, 82 Tex. L. Rev. 381, 404-05 (2003); Neil Vidmar and Mary R. Rose, *Punitive Damages by Juries in Florida: In Terrorem and In Reality*, 38 Harv. J. on Legis. 487, 506-07 (2001) (summarizing empirical studies showing high reversal rates of punitive damage awards); Samuel Issacharoff, *Can There Be a Behavioral Law and Economics?*, 51 Vand. L. Rev. 1729, 1743 (1998) (recognizing close appellate scrutiny and high reversal rate of punitive damage verdicts).

Companies, whether selling insurance, cars, or medical devices, sometimes must report potential unpaid liabilities to their shareholders and lenders, and must set aside funds to account for judgments. The fact that State Farm wanted to or needed to set aside money in reserve to pay the $202 million Campbell judgment, which in 2001 seemed likely to come due, does not mean that its insurance loss reserve was the only or best

place to do so. Many ordinary business expenses, including potential fees and liabilities from pending lawsuits, are disclosed and accounted for in reserves — without triggering the special tax treatment for insurance loss reserves of deduction before actual payment of the underlying liability. See *Brown v. Helvering*, 291 U.S. 193, 202 (1934) (noting the limited number of deductible reserves authorized by tax law and stating: "Many reserves set up by prudent business men are not allowable as deductions."). Companies that need to account to their shareholders or lenders for unpaid punitive damage awards may do so regardless of the tax treatment of the reserves they set up.

We therefore affirm the result but not the reasoning of the Tax Court with regard to the punitive damages portion of the Campbell judgment. Our analysis of the relevant statutory language in *Sears, Roebuck* does apply, at least to the extent that deference to the NAIC could be appropriate here. But the NAIC has not directed insurers to include punitive damages in deductible loss reserves before they are paid. Unlike compensatory damages (as a component of ordinary extra-contractual obligations), there is no evidence that the insurance industry regularly includes punitive damages in deductible unpaid loss reserves. The Tax Court properly held that State Farm was not entitled to take a deduction for this portion of the Campbell judgment in 2001 and 2002.

II. *The Alternative Minimum Tax Issue*

We begin our discussion of the alternative minimum tax issue raised by State Farm by commending the careful and comprehensive opinion of the Tax Court on the subject, which we affirm. 130 T.C. 263 (2008). We adopt the result and reasoning of the court's opinion, though in deference to the trees we will not reprint it here. Instead we will briefly explain the issue and the dispositive factors behind our affirmance.

The alternative minimum tax was enacted in response to the fairness concern that high-earning individuals and corporations might otherwise escape significant tax liability by employing an array of exemptions, deductions, and credits. Calculation of alternative minimum tax liability involves starting from ordinary taxable income, then adjusting back a number of allowed reductions in various ways. Through the alternative minimum tax, Congress sought to address "instances in which major companies have paid no taxes in years when they reported substantial earnings." See *CSX Corp. v. United States*, 124 F.3d 643, 648 (4th Cir. 1997), quoting from Senate Report No. 99-313 at 519. "Hence, the alternative minimum tax was designed to eliminate situations where corporations show substantial financial or book income, and yet pay little or no taxes because their taxable income is lowered by tax credits or deductions." *Id.*

As we will see, State Farm rests its proposed calculation method on the idea that the alternative minimum tax calculation seeks to better approximate "book income" at all times for the sake of symmetry. But in fact

Congress sought to tie taxable income and book income closer together for only a specific purpose — closing loopholes that were perceived as unfair. State Farm's proposed calculation method is not sound. It would produce highly artificial results, and would do so by assigning different meanings to an identical phrase where it appears in two consecutive subparagraphs of the applicable Treasury regulation.

### A. *Alternative Minimum Taxation of Insurance Companies*

We first provide some background on how the alternative minimum tax is calculated for an ordinary corporation. Internal Revenue Service Form 4626 also provides a useful guide to the procedure. The starting point for computation of alternative minimum tax is the company's taxable income (or loss) before applying any net operating loss deduction. Then the taxpayer must apply a series of adjustments and preferences to that number, which have the effect of adding back certain deductions and deferred income. This leads to a potentially larger number known to the cognoscenti as the pre-adjustment Alternative Minimum Taxable Income (pAMTI).

Next, the taxpayer must calculate its Adjusted Current Earnings (ACE) according to 26 U.S.C. § 56(g). This calculation starts from the pAMTI number and adds back more adjustments. For example, certain tax-exempt interest income is deductible from income in computing ordinary income taxes but must be added back in when computing ACE. Once the ACE is calculated,

an "ACE adjustment" is made to determine alternative minimum taxable income. Section 56(g) provides that the adjustment equals 75% of the amount of the ACE that is greater than the pAMTI. Expressed as a formula: ACE adjustment = 0.75 x (ACE – pAMTI). This ACE adjustment ordinarily would be positive if the taxpayer had income items subject to being added back, but it can also be negative if the pAMTI number starts out negative because of an overall operating loss. Once the ACE adjustment is calculated, the taxpayer can also carry forward leftover ACE adjustments from prior years. Next, the pAMTI and the ACE adjustment are added together, and the taxpayer can then apply an alternative minimum net operating loss deduction to arrive at the taxpayer's Alternative Minimum Taxable Income (AMTI). If the operating loss deduction has not brought the AMTI below zero, the alternative minimum tax is computed from the AMTI number.

As if this were not complicated enough, there are special considerations and complications when the consolidated tax return is being filed by a taxpayer like State Farm that operates both life insurance and non-life insurance subgroups. Several tax statutes and regulations treat life insurance companies differently. Because of those rules, income (or loss) of the life and non-life subgroups cannot simply be added together for purposes of filing a consolidated tax return, as is possible for other types of parent companies. Specifically, 26 U.S.C. § 1503(c) limits how companies can use losses in their non-life insurance subsidiaries to offset gains

in life insurance subsidiaries on consolidated returns. This "loss limitation" rule has previously generated confusion about which calculations must be performed separately on a subgroup basis — to avoid zeroing life gains with non-life losses — and which calculations can be done on a consolidated basis. See *State Farm Mut. Auto. Ins. Co. v. Comm'r of Internal Revenue*, 105 F. App'x 67 (7th Cir. 2004) (discussing the "book income" adjustment that was later replaced by the ACE adjustment detailed above).

In deciding the alternative minimum tax issue, the Tax Court addressed at length the choice between two alternative calculation methods other than the one advocated by State Farm. The question was whether the ACE adjustment should be calculated on a subgroup basis (as State Farm did in its initial returns, but not in the lawsuit), or on a consolidated basis, starting with a consolidated pAMTI and with allocation to subgroups after the fact. The Tax Court concluded that the relevant regulations supported the latter method, and we agree. We adopt the reasoning of the Tax Court on this question and point interested readers to the charts that the court included in an appendix to demonstrate the difference in approaches. See *State Farm*, 130 T.C. at 294, reproduced in edited form as Appendix A below. The method originally used by State Farm (chart A.1 below) and the method required by the Tax Court (chart A.3 below) ultimately came to the same end result, though. The different method that State Farm proposed during this litigation (chart A.2 below) did not come to

the same end result — in fact it created a loss $4.3 billion larger — because of a failure to apply the loss limitation rule properly.

B.  *State Farm's Proposed Calculation Method*

2001 was a very bad year for State Farm's non-life insurance subgroup, which lost $5.8 billion. State Farm's life insurance subgroup, however, had ordinary taxable income of more than $500 million. If State Farm sold vegetables or anything else other than life insurance, it would have had a consolidated net loss and its consoli-dated pAMTI would have been negative. See 26 C.F.R § 1.56(g)-1(n)(3)(i). But State Farm properly applied the loss limitation calculations of section 1503(c) and ended up with a positive pAMTI of more than $500 million. When calculating its consolidated ACE according to an adjacent subparagraph of the regulations, see 26 C.F.R § 1.56(g)-1(n)(3)(ii), State Farm proposed using a pAMTI number that did *not* apply the loss limitation rule. This negative $5.3 billion pAMTI number absorbed State Farm's substantial section 56(g) adjustments. Even after the 75% ACE adjustment discount, the new calcula-tion left State Farm with a negative $3.6 billion ACE adjustment and a negative $9.4 billion alternative mini-mum taxable income. Unsurprisingly, in a year when State Farm lost 5.3 billion real dollars overall, it was not in fact subject to any alternative minimum tax in 2001. But the net operating loss carry-back rules allowed State Farm to use this newly claimed $9.4 billion AMTI loss in prior years — to generate claims for refunds in

years when it had turned large profits and had actually paid the alternative minimum tax.[6]

State Farm argues that there is nothing fishy about using one number for pAMTI for the purpose of comparing with ACE, and another number for pAMTI for the purpose of calculating ACE — or applying section 1503(c) loss limitation rules to generate consolidated pAMTI in one place but not in another. But of course, nothing in section 1503(c), or in regulation subparagraphs 1.56(g)-1(n)(3)(i) and (ii), gives any hint that "pre-adjustment alternative minimum taxable income" could mean two different things depending on whether you are calculating it or using it to calculate something else.

One of the more reliable canons of statutory construction — the normal practice — is that a term or phrase is ordinarily given the same meaning throughout a statute. *E.g.*, *Nijhawan v. Holder*, 557 U.S. 29, 39 (2009) (applying canon to adjoining subparagraphs in immigration law); *Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 250 (1996) (applying canon to term in adjoining sections of Internal Revenue Code); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995); *Brown v. Gardner*, 513 U.S. 115, 118

---

[6] Companies ordinarily can carry losses back no more than three years, but for 2001 and 2002, post-September 11th stimulus and recovery legislation extended this period to five years, enabling State Farm to reach back to the tax years at issue here. See Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, 116 Stat. 21.

(1994); *Comm'r of Internal Revenue v. Keystone Consolidated Industries, Inc.*, 508 U.S. 152, 159 (1993).

This canon is not an absolute rule, of course. It can be overcome with persuasive evidence from the statutory text, context, or other sources that different meanings were intended. See, *e.g.*, *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 595-97 (2004); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) (general presumption is not rigid; giving phrase "wages paid" different meanings for Internal Revenue Code and Social Security taxes); *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932). But the canon that identical terms or phrases in the same statute have the same meaning surely carries a great deal of force when dealing with such a highly technical and defined term in consecutive subparagraphs of the same Treasury regulation. See *Comm'r of Internal Revenue v. Lundy*, 516 U.S. at 250 ("interrelationship and close proximity of these provisions of the statute 'presents a classic case for application of the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning"'"), quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *Hotel Equities Corp. v. Comm'r of Internal Revenue*, 546 F.2d 725, 728 (7th Cir. 1976) (agreeing with taxpayer and applying canon to give same meaning to same term in different sections of Internal Revenue Code). State Farm has offered us no persuasive reason for giving the phrase "pre-adjustment alternative minimum taxable income" a meaning in 26 C.F.R § 1.56(g)-1(n)(3)(i) different from its meaning in 26 C.F.R § 1.56(g)-1(n)(3)(ii).

State Farm defends its method by arguing that it better comports with the purpose of alternative minimum taxation because it should make taxable income more closely match "book income" or "economic income." Under both State Farm's original method and the Tax Court's method that we affirm, State Farm had a positive ACE adjustment in a year when it experienced an overall loss. This, says State Farm, is an unreasonable and incongruous result. There are several flaws in this argument.

First, as discussed above, the purpose of the alternative minimum tax is not to match taxable and book income simply for the sake of matching, but to recapture and subject to the alternative minimum tax book income that might otherwise escape taxation through many deductions, exemptions, and credits. Second, the fact that a company lost money overall in a taxable year does not imply that every number on every line of the company's tax return must be negative. For example, State Farm took a deduction (increasing its tax loss) on its ordinary tax return for hundreds of millions of dollars in tax-exempt interest income. Section 56(g) required State Farm to add that deduction back when computing adjusted current earnings for alternative minimum tax purposes. State Farm did have positive section 56(g) adjustments in 2001 and 2002, and there is nothing unusual about that result. The ACE adjustment is merely an intermediate calculation figure — one that the IRS understood could be positive even in a loss year because of the loss limitation rules. See 48 Fed. Reg. 11436, 11439 (Mar. 18, 1983) ("section 1503(c)(1) may result in a

life-nonlife group paying a tax when it has no net income"). Finally, there is the overriding unreasonableness and incongruity of the result State Farm seeks. State Farm's proposed calculations create a $9.4 billion tax loss in a year when the company actually lost ("only") $5.3 billion. The only sense in which the $9.4 billion figure lines up with State Farm's "book income" is that both are large negative numbers.

State Farm suggests that the regulations are ambiguous with regard to calculating alternative minimum tax liability on consolidated life/non-life groups, so that its proposed method should be blessed as a reasonable taxpayer resolution of ambiguity. Although the regulations are not precisely targeted to the exact question raised here, we do not think they are ambiguous. State Farm was able to understand and apply the loss limitation rule on its 2001 consolidated return twice (both times it applied pAMTI) in its original calculations, and correctly applied it once in its new proposed calculation. The Tax Court's method applies the loss limitation rule to pAMTI, and then keeps that consolidated number through a consolidated ACE calculation. State Farm's innovative suggestion that the pAMTI variable can hold two values — one value on line 3 of Form 4626 and another value when entered on line 1 of the Adjusted Current Earnings Worksheet in the instructions to that form, which says "Enter the amount from line 3 of Form 4626" — seems to be less a response to ambiguity than an attempt to create ambiguity. Even if we accepted for the purpose of argument that the regulations are ambiguous, the parties present us a

choice between (1) a method that can produce a positive intermediate adjustment (available for carrying forward) in a loss year, and (2) a method that can produce a virtual tax loss billions of dollars larger than reality and requires different meanings for the identical key phrase in consecutive subparagraphs of the same Treasury regulation. The Tax Court correctly rejected State Farm's proposed method for calculating its alternative minimum tax.

*Conclusion*

The 2008 judgment of the Tax Court on the alternative minimum tax issue is AFFIRMED. The 2010 judgment of the Tax Court with regard to the loss reserve issue is AFFIRMED in part and REVERSED in part, and the case is REMANDED for recalculation of the amount of State Farm's tax liability with an allowed deduction for the portion of the Campbell judgment that did not consist of punitive damages and interest thereon.

## Appendix A:

### Tax Court's Illustrative Charts for 2001 Tax Year

| A.1: Petitioner's Original Calculations for 2001 | | | |
|---|---|---|---|
| | Non-life Sub-group | Life Subgroup | Consoli-dated |
| Calculation of Pre-adjustment AMTI | | | |
| 1. Regular taxable income (loss) before NOL deduction | ($5,777,523,614) | $526,283,059 | $526,283,059 |
| 2. Adjustments and preferences | ($20,722,240) | ($629,289) | ($629,289) |
| 3. Pre-adjustment AMTI (to compare with ACE) | ($5,798,295,854) | $525,653,770 | $525,653,770 |
| Calculation of ACE | | | |
| 4. Pre-adjustment AMTI (to calculate ACE) | ($5,798,295,854) | $525,653,770 | $525,653,770 |
| 5. Section 56(g)(4) adjustments | $1,032,435,020 | $218,868 | $218,868 |
| 6. ACE (lines 4 + 5) | ($4,765,860,834) | $525,872,638 | $525,872,638 |
| Calculation of AMTI | | | |
| 7. Excess of ACE over Pre-adjustment AMTI (line 6 - line 3) | $1,032,435,020 | $218,868 | $218,868 |
| 8. 75% of excess | $774,326,265 | $164,151 | $164,151 |
| 9. ACE Adjustment | $774,326,265 | $164,151 | $164,151 |
| 10. AMTI before alternative tax NOL deduction (lines 3 + 9) | ($5,023,969,589) | $525,817,921 | $525,817,921 |

| **A.2: Petitioner's Revised Methodology for 2001** | | | |
|---|---|---|---|
| | Non-life Sub-group | Life Sub-group | Consolidated |
| Calculation of Pre-adjustment AMTI | | | |
| 1. Regular taxable income (loss) before NOL deduction | ($5,777,523,614) | $526,283,059 | $526,283,059 |
| 2. Adjustments and preferences | ($20,722,240) | ($629,289) | ($629,289) |
| 3. Pre-adjustment AMTI (to compare with ACE) | ($5,798,295,854) | $525,653,770 | $525,653,770 |
| Calculation of ACE | | | |
| 4. Pre-adjustment AMTI (to calculate ACE) | ($5,272,642,084) | | ($5,272,642,084) |
| 5. Section 56(g)(4) adjustments | $1,032,653,888 | | $1,032,653,888 |
| 6. ACE (lines 4 + 5) | ($4,239,988,196) | | ($4,239,988,196) |
| Calculation of AMTI | | | |
| 7. Excess of ACE over Pre-adjustment AMTI (line 6 - line 3) | — | — | ($4,765,641,966) |
| 8. 75% of excess | — | — | ($3,574,231,475) |
| 9. ACE Adjustment | ($3,573,473,926) | ($757,548) | ($757,548) |
| 10. AMTI before alternative tax NOL deduction (lines 3 + 9) | ($9,371,769,780) | $524,896,222 | $524,896,222 |

| A.3: Respondent's Position: Petitioner's Methodology Using Consistent Pre-adjustment AMTI for 2001 | | |
|---|---|---|
| | Non-life Sub-group | Life Sub-group | Consolidated |
| Calculation of Pre-adjustment AMTI | | |
| 1. Regular taxable income (loss) before NOL deduction | ($5,777,523,614) | $526,283,059 | $526,283,059 |
| 2. Adjustments and preferences | ($20,722,240) | ($629,289) | ($629,289) |
| 3. Pre-adjustment AMTI (to compare with ACE) | ($5,798,295,854) | $525,653,770 | $525,653,770 |
| Calculation of ACE | | |
| 4. Pre-adjustment AMTI (to calculate ACE) | — | — | $525,653,770 |
| 5. Section 56(g)(4) adjustments | — | — | $1,032,653,888 |
| 6. ACE (lines 4 + 5) | — | — | $1,558,307,658 |
| Calculation of AMTI | | |
| 7. Excess of ACE over Pre-adjustment AMTI (line 6 - line 3) | — | — | $1,032,653,888 |
| 8. 75% of excess | — | — | $774,490,416 |
| 9. ACE Adjustment | $774,326,265 | $164,151 | $774,490,416 |
| 10. AMTI before alternative tax NOL deduction (lines 3 + 9) | ($5,023,969,589) | $525,817,921 | $525,817,921 |